**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Derek FOSTER, Defendant–Appellant.**

**No. 90–2728.**

United States Court of Appeals, Seventh Circuit.

Argued May 7, 1991.

Decided Aug. 6, 1991.

---

**448**

Brian W. Blanchard (argued), Office of U.S. Atty., Criminal Div., Barry R. Elden, Asst. U.S. Atty., Office of U.S. Atty., Criminal Receiving, Appellate Div., Chicago, Ill., for U.S.

Michael D. Monico, Barry A. Spevack (argued), Monico, Pavich & Spevack, Chicago, Ill., for defendant-appellant.

Before WOOD, JR., and MANION, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

HARLINGTON WOOD, JR., Circuit Judge.

Passengers collected their belongings and prepared to disembark as Amtrak Train Number 4 came to a halt in Chicago's Union Station. When the doors finally opened, several hundred people, some of whom had boarded the train at its Los Angeles origination point, spilled out onto the platform and made their way toward the terminal. In the middle of this frenzied activity, one person was moving slower than the rest. Derek Foster was struggling to pull two new-looking, hard-sided suitcases and was therefore unable to keep up with his fellow passengers.

The encumbered Foster appeared nervous and repeatedly looked over his shoulder as if someone were following him. In fact, someone was; his unwieldy luggage had caught the attention of several members of a Drug Enforcement Administration ("DEA") task force. Two of the agents approached Foster as he entered the terminal, identified themselves as law enforcement officers, and requested a few moments of his time.

Foster agreed and began to set down his suitcases. One of them fell over, emitting a puff of white powder from its seam. Foster thereafter attempted to return the suitcase to an upright position but was not immediately successful. The suitcase fell over once again and more white powder billowed from its seam. An agent commented on the apparent weight of the bag, and Foster replied that he had a "box" inside. A third agent approached the group, touched and smelled the particles that had escaped from the suitcase, and determined that the substance was talcum powder.

In response to the agents' requests, Foster identified himself and produced a driver's license but claimed that he had lost his train ticket. Foster also disclaimed any ownership of the suitcases, telling the agents that he had agreed to carry them from the train to the baggage claim area as a favor to a young black male. Foster did not know this person's name, but he described the man as tall, wearing a blue jacket, and carrying two suitcases that were identical to the ones at his feet. None of the law enforcement officers had seen this man and an immediate search failed to locate anyone fitting the description.

Foster did admit, however, to ownership of the blue duffel bag that was strapped across his shoulder. He even volunteered it for search by the agents. Upon opening it, the agents discovered clothing, a digital-display beeper, a notebook, and train tickets. The tickets were issued to Mark Wynn and permitted one-way travel from Los Angeles to Chicago and from Chicago to Rockville, Maryland. They had been purchased with cash less than an hour and a half before the train had departed Los Angeles.

A quick perusal of the notebook disclosed notations reflecting weights, money, and names. It also revealed the following handwritten verse:

> Key for Key, Pound for pound I'm the biggest Dope Dealer and I serve all over town. Rock 4 Rock Self 4 Self. Give me a key let me go to work more Dollars than your average bussiness [sic] man.[1]

A receipt lodged in between the notebook's pages indicated that Foster had signed for the beeper.[2]

The agents then asked if they could search the two suitcases. Foster replied that he did not care, again explaining that this luggage did not belong to him. The group then made its way to the DEA station office and the agents opened the suitcases.[3]

One suitcase contained a kilogram of cocaine and a five-gallon can containing a liquid form of phencyclidine ("PCP"). The other suitcase contained another five-gallon can filled with liquid PCP. Talcum powder, diapers, and foam rubber had been used to pack the narcotics.

Foster, who was watching the agents' activity, commented that he had not known "that there was that much in there." When the agents completed their search, Foster was placed under arrest. He signed a waiver of his rights and, while relaying information about his personal history, asked to speak in private with his interviewer, Detective Kinsella.

After the other agents left the room, Foster gave Kinsella a very different account of how he had obtained the bags. Under this revised version, a friend promised to pay him for transporting the suitcases from Los Angeles to Rockville, Maryland. Foster knew that the suitcases contained "something," but he did not know how much.

After Foster failed in his bid to make out a violation of his fourth amendment rights, his case proceeded to trial on charges of possession with intent to distribute cocaine and PCP. *See* 21 U.S.C. § 841(a)(1). And as Foster concedes, the only disputed issue at that trial was whether he knew that he was transporting controlled substances. During the course of that trial, he believes that the district court erred when it allowed Kinsella to testify as an expert regarding the methods used by narcotics traffickers. More specifically, he charges error in the admission of testimony that Los Angeles is a major source city for cocaine and liquid PCP and that, as a general rule, drug couriers try to:

(1) Use cash instead of checks or credit cards to avoid creating a record of their activities;

---

**1.** At trial, the government offered testimony that the words "key" and "rock" were standard code words used in cocaine trafficking.

**2.** The receipt also contained the name of Foster's girlfriend, Yvonne Moore.

**3.** Both suitcases were locked and Foster denied having a key, but the agents were able to use a key that they had in the office.

(2) Avoid using their real names in travelling;

(3) Purchase travel tickets shortly before departure to avoid having their travel plans known ahead of time;

(4) Purchase one-way tickets for drug-smuggling runs;

(5) Use masking agents such as talcum powder to disguise the odor of narcotics;

(6) Use hard-sided suitcases to keep the odor of drugs from escaping;

(7) Travel by train in part because they can watch their luggage more easily;

(8) Use trains because train station security is minimal compared to security systems used in airports;

(9) Use beepers in order to permit anonymity and mobility; and

(10) Conduct countersurveillance activities to avoid detection by competitors or the police.

Foster also finds error in the admission of the verse found in his notebook and in the admission of testimony that PCP in its liquid form is dangerous to touch and highly explosive. He concludes that the admission of this evidence impermissibly contaminated his trial, but we cannot agree.[4]

## I.

■ This court applies a deferential standard in analyzing a district court's evidentiary rulings; we will presume their correctness unless the defendant "can show a clear abuse of discretion." *United States v. Carter*, 910 F.2d 1524, 1530 (7th Cir. 1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1628, 113 L.Ed.2d 724 (1991). Even if the district court has erred, moreover, reversal is required only if the error has affected "substantial rights." FED.R.CRIM.P. 52(a). In considering whether a nonconstitutional error affects substantial rights, " '[o]ur task is to gauge "what effect the error had or reasonably may be taken to have had upon the jury's decision." ' " *United States v. Zapata*, 871 F.2d 616, 622 (7th Cir.1989) (quoting *United States v. Shack-*

*leford,* 738 F.2d 776, 783 (7th Cir.1984)). Those errors that did not influence the jury or had only a very slight effect are disregarded as harmless.

### A. *Kinsella's Expert Testimony*

Foster's first challenge is in actuality a sextet of arguments that is more conveniently divided into two sub-groups. One subgroup charges that the district court should have excluded Kinsella's expert testimony in the first place because: (1) the testimony is irrelevant outside of a probable cause hearing; (2) an expertise as to the methods used by narcotics traffickers is in reality no expertise at all; (3) the significance of the underlying evidence (for example, the beeper) was well within the common understanding of the jury and did not require expert testimony; and (4) the testimony would constitute an opinion as to Foster's mental state and would therefore violate Rule 704(b) of the Federal Rules of Evidence. A second sub-group charges that, after erring in its decision to admit the evidence, the district court erred further by failing to: (1) take precautionary efforts to avoid any confusion that might have been engendered by Kinsella's role as both eyewitness and expert; and (2) allow Foster a wider latitude in cross-examining Kinsella.

■ Contrary to Foster's apparent assumption in briefing these arguments, his wide-ranging challenge on appeal is considerably broader than the scope of the objections that he articulated at trial. Even charitably read, the transcript reveals that he preserved only two issues for appeal. First, he objected to Kinsella's expert testimony about the beeper on the ground that it spoke to matters that the jury could evaluate for itself. Second, he attempted but was prevented from pursuing more extensive cross-examination of Kinsella. The unpreserved issues, therefore, must be analyzed under the plain error standard; we will reverse only if: (1) the district court made an error; and (2) that error repre-

---

**4.** The district court sentenced Foster to 151 months' incarceration to be followed by a five-year term of supervised release. A special as-

sessment was also imposed. Foster has raised no issues on this appeal regarding the propriety of that determination.

sented a "miscarriage of justice"[5] such that Foster " 'probably would have been acquitted but for the erroneously admitted evidence.' " *United States v. Carroll,* 871 F.2d 689, 692 (7th Cir.1989) (quoting *United States v. Wynn,* 845 F.2d 1439, 1443 (7th Cir.1988)); *see also United States v. Myers,* 892 F.2d 642, 645 (7th Cir.1990).

According to Foster, the government's use at trial of this type of expert testimony is a relatively new phenomenon. This circuit, however, is quite familiar with the use during trial of expert testimony as to the methods used by drug dealers. Indeed, we were confronted with and upheld the use of such testimony as early as *United States v. Ramirez,* 796 F.2d 212, 214, 216–17 (7th Cir.1986). Thereafter, in *United States v. Rollins,* 862 F.2d 1282, 1292 (7th Cir.1988), *cert. denied,* 490 U.S. 1074, 109 S.Ct. 2084, 104 L.Ed.2d 648 (1989), we indicated that "narcotics code words and the operations of drug dealers are generally an appropriate subject for expert testimony." Most recently, in *United States v. Gonzalez,* 933 F.2d 417 (7th Cir.1991), we upheld the admissibility of expert testimony that "narcotic-related phone calls" are usually short in nature so as to avoid detection. *Id.* at 428–29.[6]

■ This solid line of cases dispenses with many of the challenges raised by Foster. *United States v. Teslim,* 869 F.2d 316 (7th Cir.1989), for example, clearly rejects any per se bar to the admission of drug courier profile evidence once the probable cause hearing has concluded. If the testimony is relevant to the defendant's guilt or innocence, then it is potentially admissible at trial. *Id.* at 324; *see United States v. Solis,* 923 F.2d 548, 551 (7th Cir.1991) (expert testimony relevant as circumstantial evidence of defendant's intent to distribute cocaine).

■ The issue here was whether Foster knew that he was carrying narcotics. As placed in context by expert testimony, Foster's behavior was material to the issue of knowledge and made it "more probable" that he knew what he was carrying; Kinsella's testimony was thus relevant to the issue of Foster's knowledge. *See* FED.R. EVID. 401. And if relevant, Rule 702 allows for the admission of expert testimony if the witness is qualified and if the testimony would be helpful to the jury. FED.R.EVID. 702.[7]

■ Kinsella was clearly qualified by reason of "knowledge, skill, experience, training, or education." *Id.* His credentials included extensive training in the area of narcotics investigation, over twenty years of police work focused primarily on narcotics investigation, and approximately 2000 narcotics-related arrests. Kinsella had served as an instructor in some twenty DEA seminars and had helped to establish drug interdiction teams at airports and train stations across the country. He had also been qualified as an expert witness on approximately fifty prior occasions.

■ It is our continued belief, moreover, that this type of expert testimony is helpful to a jury. Despite our country's "war on drugs" and its accompanying media cover-

---

5. *Kubat v. Thieret,* 867 F.2d 351, 371–72 & n. 16 (7th Cir.), *cert. denied,* — U.S. ——, 110 S.Ct. 206, 107 L.Ed.2d 159 (1989); FED.R.CRIM.P. 52(b).

6. This circuit is not alone in its general acceptance of this type of testimony. *See, e.g., United States v. Boissoneault,* 926 F.2d 230, 232–33 (2d Cir.1991); *United States v. Rogers,* 918 F.2d 207, 212–13 (D.C.Cir.1990); *United States v. Theodoropoulos,* 866 F.2d 587, 590–92 (3d Cir.1989); *United States v. Shurn,* 849 F.2d 1090, 1094–95 (8th Cir.1988); *United States v. Espinosa,* 827 F.2d 604, 611–12 (9th Cir.1987), *cert. denied,* 485 U.S. 968, 108 S.Ct. 1243, 99 L.Ed.2d 441 (1988); *United States v. Stewart,* 770 F.2d 825, 831 (9th Cir.1985), *cert. denied,* 474 U.S. 1103, 106 S.Ct. 888, 88 L.Ed.2d 922 (1986); *United States v.*

*Ginsberg,* 758 F.2d 823, 830 (2d Cir.1985); *United States v. Daniels,* 723 F.2d 31, 33 (8th Cir. 1983). *But see United States v. Gomez–Norena,* 908 F.2d 497, 501 (9th Cir.), *cert. denied,* — U.S. ——, 111 S.Ct. 363, 112 L.Ed.2d 326 (1990); *United States v. Carter,* 901 F.2d 683, 684–85 (8th Cir.1990); *United States v. Hernandez–Cuartas,* 717 F.2d 552, 555 (11th Cir.1983).

7. The text of Rule 702 states:
   If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

age, it is still a reasonable assumption that jurors are not well versed in the behavior of drug dealers. "The investigator and the expert witness both serve as a link to the drug culture in providing the jury with [an] understanding of the intricate patterns and *modus operandi*" of those involved in narcotics trafficking. *Gonzalez*, 933 F.2d at 428–29; *see also United States v. De Soto*, 885 F.2d 354, 360 (7th Cir.1989) (activity that "may appear, to the outside observer, to be perfectly normal and innocent" may take on an entirely new significance when placed in context by expert testimony); *Daniels*, 723 F.2d at 33 ("The methods by which drug dealers attempt to conceal their activities '[are] not something with which most jurors are familiar.'") (quoting *United States v. Scavo*, 593 F.2d 837, 844 (8th Cir.1979)).[8]

■ Our general acceptance of this type of testimony notwithstanding, we are not unmindful of its potential for undue prejudice. Indeed, we have held that the district court and the prosecutor must be vigilant in ensuring that the expert's testimony does not become so broad that it speaks to matters that the jury can evaluate for itself. *De Soto*, 885 F.2d at 361. When the expert witness also serves as an eyewitness, the district court and the prosecutor should exercise special caution to ensure that the jury understands its function in evaluating the evidence and is not confused by the witness's dual role. *Id.* at 360, 361.

■ Our review of the record assures us that the district court and the prosecutor were aware of their special responsibili-

ties and proceeded with the requisite degree of caution. Kinsella's testimony was within that range that would be helpful to the jury in determining whether Foster knew what he was carrying. It may be innocent behavior to purchase a one-way train ticket, for cash, on the same day as departure from a source city for illegal drugs, under a false name, and carrying a beeper, but it is a fair use of expert testimony to offer another explanation for such behavior. The same rationale holds true for the remainder of Kinsella's testimony. *See Gonzalez*, 933 F.2d at 428–29 (upholding admission of expert testimony that narcotics-related conversations are generally brief); *Solis*, 923 F.2d 548 (upholding admission of expert testimony that beepers are tools of narcotics trade); *United States v. Briscoe*, 896 F.2d 1476, 1497 (7th Cir.) (upholding admission of expert testimony concerning meaning of code terms and phrases used by narcotics traffickers), *cert. denied*, —— U.S. ——, 111 S.Ct. 173, 112 L.Ed.2d 137 (1990); *De Soto*, 885 F.2d at 360–61 (upholding admission of expert testimony concerning countersurveillance techniques employed by narcotics traffickers); *Rollins*, 862 F.2d at 1292 (upholding admission of expert testimony as to use of code words by narcotics traffickers).[9]

■ The district court was sensitive, moreover, to the need to confine Kinsella's testimony to comments that would be helpful to the jury. As one example, the district court prevented Kinsella from expressing an opinion as to whether it would be unusual for a narcotics trafficker to deny possession of luggage that contained narcotics. The district court then gave a

---

8. Foster relies heavily upon *United States v. Arenal*, 768 F.2d 263 (8th Cir.1985). The narcotics-related expert testimony in that case is distinguishable, however, in that it not only described the significance of certain conduct or physical evidence in general but also drew conclusions as to the significance of that evidence in the particular case, conclusions that the Eighth Circuit believed within the knowledge or experience of the jury. *Id.* at 269–70.

9. Our only hesitation lies in the fact that the district court allowed testimony that narcotics traffickers use talcum powder in order to disguise the odor of narcotics. The talcum powder, like the narcotics, was *inside* the suitcases;

this part of Kinsella's testimony thus assumes that Foster knew what was inside the suitcases, which is exactly the point for which the evidence was submitted. The record, however, indicates that the suitcases were not entirely successful in containing the talcum powder, thus giving rise to a fair inference that Foster knew about the powder, which in turn would appear to permit Kinsella's expert testimony as to its use by narcotics traffickers. In any event, Foster failed to raise an objection before the district court on this testimony and any error that might have occurred would not meet the demanding standard of FED.R.CRIM.P. 52(b).

contemporaneous instruction: "What people do when accused of wrongdoing is an issue that the jury can determine based on their common experiences in life and their common sense."

The district court was also sensitive to the need to prevent any jury confusion that might be engendered by Kinsella's dual role. A witness may testify as both an eyewitness and an expert witness during the course of the same trial, see De Soto, 885 F.2d at 360; see also Solis, 923 F.2d at 551, but this dual role may increase the possibility that the jury will not understand its function in evaluating the evidence. De Soto, 885 F.2d at 360. As in De Soto, however, our concerns have been addressed by the use of cautionary instructions and thorough cross-examination.

■ As to cautionary instructions, the district court qualified Kinsella with the statement, "You may proceed by way of Rule 702"; scrupulously neutral terms that did not serve to overemphasize his role as an expert. Later, in qualifying another expert witness, the district court read the text of Rule 702 to the jury. The jury instruction on expert testimony, taken directly from this court's Pattern Instruction 3.27, followed up these preliminary remarks with another explanation of Rule 702 and also told the jurors that they were free to credit as much or as little of Kinsella's testimony as they saw fit.[10] While Foster would in hindsight demand more in the way of instructions from the district court, we believe that the district court did enough under the circumstances. At least part of the blame for this alleged "error," moreover, must be attributed to Foster; he failed to request more extensive instructions on this issue and failed even to raise the issue until this appeal.

■ Foster's prosecutor was also cognizant of the need to prevent jury confusion. While a portion of Kinsella's testimony alternated between eyewitness observations and expert opinions, the manner in which the examination was conducted made sufficient attempts to distinguish the two. During closing arguments, moreover, the prosecutor was careful not to place undue emphasis on Kinsella's expert testimony:

> You heard testimony the pager is a tool of the trade in drug [trafficking]. And we're not saying to you it's not used for other reasons; of course it is. We know that in our daily lives. Doctors use them, lots of people use them.
>
> But sometimes they're not used for appropriate purposes. And sometimes the people that use them are narcotics couriers; and they use them, as you heard from the testimony, to keep in touch with the people they're transacting their narcotic[s] business with.

■ As to the scope of cross-examination, Foster points only to a few areas in which he was restricted in his cross-examination of Kinsella. This portrayal, however, unfairly belittles the fact that the cross-examination was otherwise quite extensive; the district court gave Foster wide latitude. For example, Foster was allowed to ask Kinsella, in his expert capacity, whether narcotics traffickers generally received assistance from their relatives in purchasing airline or train tickets. The district court also permitted Foster to relitigate, almost in its entirety, the propriety of the original stop. Compare Teslim, 869 F.2d at 324 (probable cause is issue for judge, not jury). There were some restrictions on Foster's efforts, but these restrictions were not as serious as Foster now suggests. De Soto, moreover, does not require the district court to permit highly irrelevant or otherwise impermissible cross-examination.[11] See United States v. De-

---

**10.** The full text of the instruction provided:

You have heard testimony of expert witnesses. This testimony is admissible where the subject matter involved requires knowledge, special study, training, or skill not within ordinary experience, and the witness is qualified to give an expert opinion.

However, the fact that an expert has given an opinion does not mean that it is binding upon you or that you are obligated to accept the expert's opinion as to the facts. You should assess the weight to be given to the expert opinion in the light of all the evidence in this case.

**11.** Foster maintains that he was not permitted

*gaglia,* 913 F.2d 372, 377 (7th Cir.1990) ("Although criminal defendants enjoy the constitutional guarantee that they will have an effective opportunity to test the accuracy of adverse evidence, 'this guarantee does not include the opportunity to test the evidence "in whatever way, and to whatever extent the defense might wish." ' ") (quoting *Briscoe,* 896 F.2d at 1492).

The only remaining issue in this original sextet is whether Kinsella's testimony included or comprised an impermissible opinion on Foster's mental state. FED. R.EVID. 704(b).[12] Foster has not identified, however, and this court could not locate, any specific statement in which Kinsella opines that Foster had the requisite mental state. Instead, Foster asserts that Kinsella's testimony was impermissible merely because the jury could use it to infer that Foster had the requisite mental state.

As the D.C. Circuit has persuasively noted, however, acceptance of Foster's logic "would swallow the permissive aspects of Rule 704." *United States v. Dunn,* 846 F.2d 761, 762 (D.C.Cir.1988) (expert's testimony that quantities of drugs, drug packaging material, drug paraphernalia and weapons located in town house indicated retail drug operation did not violate Rule 704(b)).

All expert evidence assists jurors in analyzing and drawing inferences from other evidence; in so doing it may support inferences as to ultimate intent. . . . Suppose, for example, that an expert testifies at a homicide trial that the victim died of a poison administered daily in small doses over a long period. The evidence goes not only to what happened, but suggests extreme premeditation on the part of whomever doled out the poison. It is only as to the last step in the inferential process—a conclusion as to the defendant's actual mental state—that Rule 704(b) commands the expert to be silent.

*Id.* Kinsella's testimony thus fell within permissible bounds. It merely assisted the jury in coming to a conclusion as to Foster's mental state; it did not make that conclusion for them. *Compare United States v. Windfelder,* 790 F.2d 576, 582 (7th Cir.1986) (expert witness testified that defendant " 'intentionally understated his income,' " which was element of crime).

In sum, both the type of testimony given by Kinsella and the circumstances surrounding its admission indicate that the district court was well aware of the problems inherent in admitting this relevant but potentially volatile testimony. These

---

an opportunity to examine Kinsella as to whether the beeper found in Foster's possession had been used to conduct illegal activity. The record discloses, however, that Foster asked Kinsella, "Did you investigate in your expert capacity to determine . . . who was contacted with this beeper?" And Kinsella responded, "There are no records of who would be contacted with that beeper as far as I know." Foster wanted to continue this line of questioning, hoping to discover whether Kinsella had investigated Yvonne Moore or Mark Wynn, but the district court sustained the prosecutor's objections under the rationale that the government's investigation or lack of investigation into other potential sources of the drugs was irrelevant to the charges for which Foster stood trial.

Foster also finds fault in the district court's refusal to allow him to suggest that his stop was racially motivated. As an initial matter, however, it is far from clear that this particular piece of evidence was in any way relevant to Foster's knowledge (or lack thereof) of the contents of the suitcases. Relevance issues aside, the record defies Foster's present claim that he was not allowed to conduct reasonable cross-ex-

amination on this matter. In response to Foster's pretrial suggestion that some form of racial harassment had occurred, the prosecutor demanded a proffer. Under instructions from his client, however, Foster's attorney initially refused to reveal any of the alleged evidence of racial harassment. The only statement ever identified ("Jackpot. We got you now, boy.") was in fact the subject of cross-examination.

12. Rule 704(b) provides:

No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone.

This language specifically contemplates expert testimony *"with respect to* the mental state or condition of a defendant," its prohibition relates only to the "ultimate issue" of whether the defendant actually "did or did not have" the requisite mental state.

factors also indicate that the district court was careful to address those problems in a manner that avoided unfair prejudice to Foster. We will not, under these circumstances, label the district court's decision an abuse of discretion.

## B. *The Verse*

Foster's second evidentiary challenge to his conviction is that the district court erred in admitting the verse found in his notebook. Although the government argued that the verse was admissible without limitation because it was " 'intricately related to the facts of the case,' " *United States v. Monzon*, 869 F.2d 338, 343 (7th Cir.), *cert. denied*, 490 U.S. 1075, 109 S.Ct. 2087, 104 L.Ed.2d 650 (1989), the district court concluded otherwise and admitted the verse under the government's fall-back argument—Rule 404(b).[13] It then gave a contemporaneous instruction:

> The document is received for a limited purpose. It is not received to establish that the defendant is, in fact, the biggest dope dealer. It is not received that the defendant makes more dollars than the average businessman. It is not received for that purpose. It is received for a limited purpose.

> The admissibility of evidence of other acts or crimes is governed by Rule 404(b) of the Federal Rules of Evidence, which provides that such evidence may not be used to prove a person's bad character or his propensity to commit crimes in conformity with that character, but may be used for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge or absence of mistake or accident.

> The limited purpose for which the document is received is only as to evidence of knowledge and intent. The defendant is accused in the indictment of having

knowledge and intention; that he knowingly and intentionally did something.

This instruction illustrates the care with which the district court treated this issue, and in large part supports our conclusion that the decision to admit the verse did not constitute an abuse of discretion.

■ Foster's argument is straightforward; he claims that the prejudice from admitting the verse clearly outweighed its minimal relevance to the issue of knowledge. As to relevance, he argues that the verse "certainly was nothing that could show knowledge of what was in the suitcases" because the verse "made no reference to the suitcases he carried, or to the trip he was making." This view of relevance, however, is unduly restrictive. The verse, standing alone, need not have been enough to prove knowledge; it is sufficient that the verse made it more probable that Foster had knowledge (and, therefore, more probable that he was guilty of the crime charged). *United States v. York*, 933 F.2d 1343, 1351 (7th Cir.1991) (citing FED.R.EVID. 401). In our view, the verse clearly meets that test; it indicated, at a minimum, that Foster was familiar with drug code words and, to a certain extent, narcotics trafficking, a familiarity that made it more probable that he knew that he was carrying illegal drugs.

■ Foster's knowledge, moreover, was relevant to the charges that he faced and was, in Foster's words, "the only issue in the case." *Compare United States v. Wright*, 901 F.2d 68 (7th Cir.1990) (Rule 404(b) evidence inadmissible to prove intent and "identity" if they are not at issue). Foster even defended on that basis, offering an innocent explanation for his activities and maintaining that he had no knowledge of the suitcases' contents. And under these circumstances, the verse achieved heightened relevance by virtue of the fact that it also rebutted Foster's protestations

---

**13.** If the government had succeeded in its bid to avoid Rule 404(b), the record suggests that it would have dealt with the potential hearsay problem in the same way, i.e., by offering the evidence for other than the truth of the matter asserted. These facts, however, suggest another option for dealing with the hearsay issue; specifically, it appears that the government could have categorized the statement as an admission by a party opponent. *See* FED.R.EVID. 801(d)(2). We do not address this scenario, nor do we find it necessary to address the government's theory, in view of our conclusion that the verse was admissible under Rule 404(b).

of naiveté. *York*, 933 F.2d at 1350 ("When the defendant affirmatively denies having the requisite intent by proffering an innocent explanation for his actions, the government is entitled to rebut that argument" by means of Rule 404(b) evidence).

Before moving on to prejudice, however, it is necessary to discuss one further point. Foster attempts to destroy, or at least diminish, the relevance of the verse by claiming that it was written for eventual incorporation into a rap song. These are rap lyrics, he claims. They have artistic value. They are fiction, just like Dashiel Hammett's description of violent acts in *The Maltese Falcon*. And as such, they cannot be relevant to his guilt.

This court has not faced such an argument in the past nor, does it appear, have many others. Indeed, the parties have cited no cases that are really on point, and this court has discovered only one case discussing the admission of a defendant's own literary or artistic work under a Rule 404(b) theory. In *State v. Hanson*, 46 Wash.App. 656, 731 P.2d 1140, *review denied*, 108 Wash.2d 1003 (1987), a state appellate court reversed a conviction under the rationale that the defendant's fictional writings were not probative of the defendant's character and too prejudicial to be admitted under the state's version of Fed. R.Evid. 404(a). The court suggested, however, that there may be instances in which a defendant's fictional writings would be admissible under the state equivalent of Fed.R.Evid. 404(b).

If nothing else, *Hanson* underscores the need to recall that the rap verse was not admitted to show that Foster was, in fact, "the biggest dope dealer"; it was not admitted to establish that Foster was the character portrayed in the lyrics. But in writing about this "fictional" character, Foster exhibited knowledge of an activity that is far from fictional. He exhibited some knowledge of narcotics trafficking, and in particular drug code words. It was for this limited purpose that the verse was admitted, and it is for this limited purpose that its relevance is clear. *Compare Monzon*, 869 F.2d at 344–45 (certain evidence

indicating "use of controlled substances"—i.e., that defendant had marijuana butts in his car and that he sported a long pinky fingernail—held inadmissible to establish intent to distribute cocaine).

Much of Foster's argument on this point is therefore of limited usefulness because, to answer his concerns by the same type of analogy, admitting the rap verse was not the equivalent of admitting *The Godfather* as evidence that Mario Puzo was a mafia don or admitting "The Pit and the Pendulum" as evidence that Edgar Allen Poe had tortured someone. It was, instead, the equivalent of admitting *The Godfather* to illustrate Puzo's knowledge of the inner workings of an organized crime family and admitting "The Pit and the Pendulum" to illustrate Poe's knowledge of medieval torture devices. Rap music, under Foster's definition, "constitutes a popular musical style that describes urban life"; it describes the reality around its author. And it is Foster's knowledge of this reality, as evidenced by the verse that he has admittedly authored, that was relevant to the crimes for which he was charged.

█ This brings us to the matter of prejudice. Foster asserts that the admission of the verse, given its allegedly nonexistent probative value, was clearly prejudicial. We agree that the verse was prejudicial to Foster, but that concession benefits him little. All evidence offered by the prosecutor is prejudicial to the defendant; there would be no point in offering it if it were not. *See United States v. Sophie*, 900 F.2d 1064, 1076 (7th Cir.) ("[A]ll probative evidence is prejudicial to the party against whom it is introduced."), *cert. denied*, —— U.S. ——, 111 S.Ct. 124, 112 L.Ed.2d 92 (1990). The real focus should be on whether the evidence is "unduly prejudicial." *Huddleston v. United States*, 485 U.S. 681, 691, 108 S.Ct. 1496, 1502, 99 L.Ed.2d 771 (1988).

The Supreme Court in *Huddleston* identified four ways in which a defendant is protected from undue prejudice arising from Rule 404(b) evidence. *Id.* at 691–92, 108 S.Ct. at 1502. These protections are: (1) the evidence must be admissible for a

proper purpose under Rule 404(b); (2) the evidence must be relevant under Rule 402; (3) the evidence must survive Rule 403's balancing test; and (4) the evidence must be the subject of a jury instruction, if requested under Rule 105, that the evidence is to be considered only for the proper purpose for which it is admitted. *Id.; see also United States v. Murphy*, 935 F.2d 899, 901 (7th Cir.1991). Of the four we have already found that three are present in this case. This leaves only Rule 403, in which the district court is directed to use a balancing test to determine whether the probative value of the evidence "is substantially outweighed by the danger of unfair prejudice." FED.R.EVID. 403.

As with any evidence admitted under Rule 404(b), there is always a possibility of unfair prejudice, i.e., that a jury could use the verse to draw forbidden inferences. *York*, 933 F.2d at 1349. There is also, as we have just explained, a legitimate inference that may be drawn from the verse. The task of assessing the relative impact of these inferences, and any accompanying potential for unfair prejudice, is one that, "to a large extent, requires a contemporaneous assessment of the presentation, credibility, and impact of the challenged evidence." *Id.* at 1352. The district court is thus uniquely suited to that task, and we have rarely hesitated to uphold the results of such a balancing act where, as here, the district court has exercised such great care.

## C. The Attributes of Liquid PCP

█ Foster's last challenge takes issue with the district court's decision to allow Officer Boyle to testify that liquid PCP is dangerous to touch (contact with the skin is the equivalent of ingestion) and highly explosive, claiming that the sole purpose of offering this evidence was "to inflame the jury." *See Ferrier v. Duckworth*, 902 F.2d 545, 548 (7th Cir.), *cert. denied,* — U.S. ——, 111 S.Ct. 526, 112 L.Ed.2d 536 (1990). It is far from clear that this testimony was "inflammatory," however. We are inclined to agree with the district court's observation on the matter: "I don't think it's any shocking ... shocking thing for the jury to know that narcotics substances are danger-

ous in one form or another. That this particular one happens to be dangerous also in terms of being an explosive is simply one of the facts of the case." Foster's present argument is also somewhat difficult to understand in light of his behavior at trial; his closing argument openly ridiculed the idea that liquid PCP could be explosive.

The record also belies Foster's argument about the lack of a legitimate purpose for introducing the evidence. Foster's cross-examination of several of the DEA agents had focused on the activity that had occurred when Foster, the suitcases, and the agents had arrived at the DEA's station office. Detective Boyle had been present during the events in question, but his focus for most of that time had been elsewhere; he was concentrating on the contents of the suitcase, in particular the liquid PCP. The prosecutor anticipated that Foster would follow the same line of cross-examination as to Boyle and wanted to preempt the effect of those questions by offering a reason why Boyle was not paying attention to the activity around him. The questions, moreover, were narrowly tailored to this purpose and the prosecutor made use of a side bar to give advance notice of the government's intentions to the district court and the defense attorneys.

The evidence thus had purpose beyond mere "inflammation" of the jury. *Compare id.* ("The only conceivable reason" for placing photographs of a bloody murder scene in evidence was to inflame jury against defendant). This purpose arose by virtue of Foster's own trial tactics. And these facts, in combination with the fact that it is open to question whether the evidence was really inflammatory at all (or, at best, that the potential for unfair prejudice was minimal), support our decision to uphold the admission of this testimony as properly within the district court's discretion.

## II.

Foster portrayed himself as a young man taking his first train ride who, in a text-

**458**

book example of the golden rule, offered to assist a fellow passenger in transporting some heavy suitcases to the baggage claim area. The jury did not believe him, but the blame for this disbelief cannot be pinned upon the district court. The challenged evidence was relevant for the purposes for which it was admitted and the district court exercised the requisite degree of care when allowing the evidence to go before the jury. There was no abuse of discretion here, and Foster's convictions and sentence are therefore

AFFIRMED.