**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**John DOE, a/k/a Owen Lawrence Smith,
a/k/a Azubuike Madabuchi Iroh,
Defendant–Appellant.**

No. 97–2916.

United States Court of Appeals,
Seventh Circuit.

Argued May 11, 1998.

Decided July 13, 1998.

Kenneth M. Hays (argued), Office of the United States Attorney, South Bend, IN, for Plaintiff–Appellee.

Kenneth P. Tableman (argued), Kenneth P. Tableman, P.C., Lansing, MI, for Defendant–Appellant.

Before BAUER, FLAUM, and MANION, Circuit Judges.

FLAUM, Circuit Judge.

Defendant John Doe raises several challenges to his convictions and sentence on heroin charges, including a claim that the Government's introduction of drug courier profile evidence at trial constituted impermissible character evidence. We reject Doe's arguments on appeal and affirm his convictions and sentence.

I.

United States customs officials in New York intercepted a package sent from Vietnam and bound for a residence in Elkhart, Indiana. The package contained 262 grams of 70%-pure white heroin hidden inside a hollowed-out book. Law enforcement authorities in Elkhart were notified, and the police arranged for a controlled delivery of the package to the residence. The defendant and his companion, Marla Cones, were apprehended when they arrived at the residence and took possession of the package.

The defendant claimed to be a United States citizen born in the Virgin Islands, and he presented identification (which was later discovered to be false) identifying himself as

Owen Lawrence Smith.[1] The police took "Smith" to a park near the scene of the arrest, and the defendant waived his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and answered questions for about an hour. The defendant told police that the package was intended for him and that Cones, who was his girlfriend, was not involved. He also explained that he had been expecting a book from his brother in Amsterdam and that he had no knowledge that the package contained heroin. The defendant remained handcuffed in the back seat of the squad car during the entire interrogation, and he claims that the officers held a gun to his head during part of that time. Some of the officers wore masks, which they later explained were necessary to protect their identities because they were involved in local undercover drug operations.

After a jury trial, Doe was convicted of possession with intent to distribute heroin, *see* 21 U.S.C. § 841(a)(1); attempted possession of heroin over 100 grams, *see id.* §§ 846, 841(a)(1) & (b)(1)(B); importation of heroin and aiding and abetting importation of heroin, see *id.* §§ 952, 960(b)(2); 18 U.S.C. § 2; and use of a false social security number, *see* 42 U.S.C. § 408(a)(7)(B). The court sentenced Doe to 180 months in prison on each of the three heroin charges and 60 months on the charge of using a false social security number, with the sentences to run concurrently.

## II.

Doe raises four claims on appeal. First, he argues that the district court erred by admitting expert testimony at trial concerning the profile of Nigerian drug traffickers. Second, Doe contends that statements he made to police during his interrogation in the park should have been suppressed because the interrogation violated *Miranda.* Third, Doe maintains that the district court erred in departing upward in his sentence in light of

the heroin's high purity. Finally, Doe argues that the court erred in imposing a two-level increase in his sentence for obstruction of justice based on its conclusion that Doe perjured himself during the suppression hearing.

### A. Drug Profile Testimony

Vincent Balbo, an experienced agent with the Drug Enforcement Agency, testified as an expert witness at Doe's trial regarding the practices of Nigerian drug smugglers. Balbo testified that white heroin from Southeast Asia is commonly smuggled into the U.S. through Nigerian traffickers. Balbo explained that smaller cities, with less law enforcement capacity, are increasingly common destinations for these heroin shipments. He also stated that Nigerian traffickers often use the mailing addresses of other individuals—colloquially known as "smurfs"—to receive imported heroin, and he testified that Nigerian traffickers are skilled in the use of false identities to elude detection by law enforcement.

■ Doe argues that this testimony should have been excluded because its prejudicial nature substantially outweighed its probative value, *see* Fed.R.Evid. 403, and because it constituted impermissible character evidence, *see* Fed.R.Evid. 404(a). Because Doe did not object to Balbo's testimony at trial, we review the district court's decision to admit the testimony for plain error, which requires Doe to "not only prove that the admission of the testimony was error, but also that reversal is required to prevent a miscarriage of justice." *United States v. Funches,* 84 F.3d 249, 254 (7th Cir.1996) (quotation omitted).

We consider first Doe's contention that the prejudicial nature of Balbo's testimony substantially outweighed its probative value. We have upheld the admission of drug courier profile evidence against Rule 403 objections on several occasions. *See, e.g., United*

---

**1.** The defendant gave police a birth certificate, social security number, driver's license, and an employee identification card from the United Parcel Service, all bearing the Smith name. Police later learned that the social security card was validly issued to an "Owen Smith," but the real Smith was born in 1992. In the course of

their investigation, police learned that the defendant also went by the name of Azubuike Madabuchi Iroh. According to a friend of Cones, the defendant had introduced himself to her and to Cones as Iroh and had claimed to be from Nigeria.

*States v. Brown*, 7 F.3d 648, 654–55 (7th Cir.1993); *United States v. Foster*, 939 F.2d 445, 452 (7th Cir.1991); *United States v. Solis*, 923 F.2d 548, 550–51 (7th Cir.1991). Despite "[o]ur general acceptance of this type of testimony," *Foster*, 939 F.2d at 452, however, the balance between probative value and unfair prejudice must be freshly assessed in each individual case.

Balbo's testimony in this case was probative of the issue of Doe's intent to possess and distribute heroin. The Government endeavored to prove the essential element of intent through a variety of circumstantial evidence, including the events surrounding the seizure of the heroin shipment and Doe's arrest, the false identities used by Doe, and Doe's use of countersurveillance techniques in driving away from the scene of the delivery prior to his apprehension by police. Balbo's testimony shed light on the issue of intent by providing a context for Doe's behavior that permitted the jury to infer that Doe must have known that the package contained heroin. Balbo explained the common practices and *modus operandi* of Nigerian drug traffickers, and the jury was left to compare that information to the facts of this case and Doe's own behavior. *See Solis*, 923 F.2d at 551 (upholding admission of drug courier profile evidence as probative of intent in a cocaine distribution case).[2]

■ Furthermore, we find little suggestion in the record that Balbo's testimony unfairly prejudiced Doe. "[W]e are not unmindful of [the] potential for undue prejudice" posed by drug courier profile evidence, *Foster*, 939 F.2d at 452, and we have identified factors that make such evidence particularly prejudicial. For instance, if the expert witness was also an eyewitness or otherwise involved in the defendant's arrest, there is a greater danger of unfair prejudice. This dual role may confuse the jury, which may not understand its own function in evaluating the evidence. *See id.* at 453; *see also Solis*,

923 F.2d at 551; *United States v. de Soto*, 885 F.2d 354, 360 (7th Cir.1989). Special cautionary instructions may be warranted in such a case. *See Foster*, 939 F.2d at 453. We have also noted the importance of a full opportunity for cross-examination to explore the validity of the profile and to suggest possible legitimate explanations for the defendant's conduct. *See Solis*, 923 F.2d at 551.

In light of these factors, we do not believe that Balbo's testimony was unfairly prejudicial. Balbo explicitly stated that he was not involved in Doe's arrest and that he appeared only to provide information about heroin trafficking in general. Doe's counsel cross-examined Balbo at length about the basis for the Nigerian drug trafficker profile and the extent of Balbo's knowledge regarding the Southeast Asian white heroin trade. Because of the limited scope of the testimony and the full opportunity for cross-examination, Balbo's testimony did not pose a significant risk of confusing the jury and did not lead the jury to assign greater weight to the testimony than it merited. Accordingly, we conclude that Doe has failed to show that the decision to admit this testimony at trial was plainly erroneous under Rule 403.

Doe also claims that Balbo's testimony constituted impermissible "group character evidence" that should have been excluded under Federal Rule of Evidence 404(a). According to Doe, the use of drug courier profile evidence at trial invites the jury to infer the defendant's guilt solely from the defendant's apparent membership in a nefarious group. This inference, Doe argues, is not based on facts pertaining to the particular defendant and the particular crime charged. Rather, the inference of guilt arises because the jury ascribes to the defendant the motivation of third parties who are not connected to the charged crime. *See generally* 22 CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE AND PROCE-

---

**2.** Although his testimony provided background from which the jury could draw inferences regarding intent, Balbo refrained from commenting directly on Doe's subjective state of mind. Thus, Balbo's testimony was consistent with Federal Rule of Evidence 704(b), which prohibits expert opinion testimony on the ultimate issue of

the defendant's mental state. *See United States v. Hubbard*, 61 F.3d 1261, 1275 (7th Cir.1995), *cert. denied*, 516 U.S. 1175, 116 S.Ct. 1268, 134 L.Ed.2d 216 (1996); *United States v. Willis*, 61 F.3d 526, 533 (7th Cir.1995), *cert. denied*, 518 U.S. 1007, 116 S.Ct. 2528, 135 L.Ed.2d 1052 (1996).

DURE–EVIDENCE § 5233 & n. 53.2 (Supp. 1998); Mark J. Kadish, *The Drug Courier Profile: In Planes, Trains, and Automobiles; and Now in the Jury Box*, 46 Am. Univ. L.Rev. 747, 782–90 (1997); see also David McCord, *Syndromes, Profiles and Other Mental Exotica: A New Approach to the Admissibility of Nontraditional Psychological Evidence in Criminal Cases*, 66 Or. L.Rev. 19, 51–57 (1987) (making a similar point with respect to child sexual abuser profiles and battering parent profiles).

■ Although some state courts have mentioned this group character argument favorably in excluding profile evidence, *see Minnesota v. Williams*, 525 N.W.2d 538, 547–49 (Minn.1995) (drug profile evidence); *Ohio v. McMillan*, 69 Ohio App.3d 36, 590 N.E.2d 23, 50–51 (Ohio Ct.App.1990) (sexual abuser profile evidence), Balbo's testimony in this case cannot fairly be described as evidence of a character trait, group or otherwise. We doubt that a fully satisfactory, comprehensive definition of "character evidence" is possible, but we have stated that " '[c]haracter trait' refers to elements of one's disposition, 'such as honesty, temperance, or peacefulness.' " *United States v. West*, 670 F.2d 675, 682 (7th Cir.) (quoting McCormick on Evidence § 195), *cert. denied sub nom. King v. United States*, 457 U.S. 1124, 102 S.Ct. 2944, 73 L.Ed.2d 1340 (1982), *and cert. denied sub nom. Jeffers v. United States*, 457 U.S. 1139, 102 S.Ct. 2972, 73 L.Ed.2d 1359 (1982). See also 22 Wright, et al., § 5233 & n. 10 ("[Character] is to be considered . . . as the actual moral or psychical disposition . . . .") (quoting 1 Wigmore, Evidence, 3d ed.1940, § 52). Thus, character evidence typically involves personality traits, such as diligence, aggressiveness, honesty, and the like, that create a propensity for acting in certain ways under certain conditions.

Balbo's testimony regarding Nigerian drug trafficking patterns did not constitute evidence of character traits. Far from suggesting that Doe had a "propensity" to import or distribute drugs—as, for instance, a dishonest person might have a propensity to lie, or a hot-tempered person might have a propensity to throw the first punch—Balbo's testimony served only to illuminate the *modus operandi* of Nigerian importers of Southeast Asian heroin. This testimony provided a context for the jury to consider in evaluating proposed explanations of Doe's observed behaviors. Balbo's testimony did not reflect on Doe's character or, for that matter, on the "character" of admitted Nigerian heroin traffickers. It did reflect on the methods of such traffickers, but we do not believe that Rule 404 was meant to exclude such evidence any more than it would exclude evidence of the methods of safecrackers or cat burglars.

We are sympathetic to the core concern underlying the "group character evidence" argument, which is that juries should not conclude that a particular defendant is guilty simply because the defendant shares some characteristics with a particular group. If the only purpose of profile evidence is to support an inference of guilt by association, then an objection to the evidence would be well-founded. For instance, a "profile" that consisted of nothing more than stereotypes about a certain segment of the population would plainly be more prejudicial than probative. As discussed above, however, this was not the thrust of Balbo's testimony about the *modus operandi* of Nigerian drug traffickers, which delved into specifics about the typical routing of the drug, methods of delivery, and efforts to avoid detection by police.

Furthermore, as far as the danger of impermissible inferences is concerned, we are fully cognizant that drug profile evidence may be problematic if it is insufficiently cabined, if the testifying expert is also an eyewitness and no clarifying instruction is given, or if the court unduly curtails cross-examination and prevents exploration of the profile and other explanations of the defendant's behavior. But these concerns are adequately addressed under Rule 403, and we do not find the attempt to recast these concerns through the vehicle of Rule 404 to be convincing in this case. Thus, we conclude that Doe has failed to show that admission of Balbo's testimony was plainly erroneous under Rule 404.

*B. Suppression Hearing*

Doe claims that the statements elicited from him during the interrogation in the

park should have been suppressed because he involuntarily waived his *Miranda* rights. Although Doe signed a form waiving his *Miranda* rights after the officers brought him to the park, he claims that this waiver was involuntary because the officers threatened him with a gun. Doe further contends that he did not make any statements to the police during this episode; the statements attributed to him were allegedly fabricated by the police. Finally, even apart from these alleged instances of gross police misconduct, Doe argues that his waiver was involuntary based on the coercive setting alone: He was forced to sit handcuffed for over an hour in a squad car, in a deserted and remote location, with officers who were wearing masks to hide their identities.

Officer Barry Snyder testified for the prosecution at the suppression hearing. He admitted that the officers kept Doe handcuffed in the car during the interrogation, and he conceded that some of the officers wore masks. He denied that anyone held a gun to Doe's head, and he affirmed that Doe indeed made the statements attributed to him during the interrogation.

The suppression hearing therefore turned on the district court's assessment of the credibility of the witnesses. The court noted that both Doe and Officer Snyder had very good demeanor, and it stated that its credibility determination "has nothing to do with the demeanor of the witnesses because both witnesses held up very well during grueling crosses by both sides." In the end, the district court credited the officer's account of events. The court expressed residual uneasiness with the officers' conduct in this case, however, stating that "I can't imagine why the police followed the course of conduct that [the officer] testified to as far as taking the defendant to an isolated place for questioning rather than to the police station, and then keeping him in the car cuffed behind his back ... for another two hours or so while other leads are followed up by other police officers." The district court, however, did not find this admitted conduct alone to be so coercive as to render Doe's *Miranda* waiver involuntary, and it therefore declined to suppress the evidence from the interrogation.

■ We review *de novo* the district court's ultimate determination that a waiver of *Miranda* rights was knowing and voluntary, but we review the district court's findings of historical fact for clear error. *See United States v. Westbrook*, 125 F.3d 996, 1001 (7th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 643, 139 L.Ed.2d 621 (1997); *United States v. Mills*, 122 F.3d 346, 350–51 (7th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 637, 139 L.Ed.2d 615 (1997). Doe suggests that no deference is due in this case because the district court did not base its decision on the demeanor of the witnesses, which was equally good on both sides. But the determination that the officers did not hold a gun to Doe's head is a question of historical fact, as is the conclusion that Doe did in fact make the statements attributed to him. Although these credibility determinations relied more on the overall plausibility of the competing accounts than on the demeanor of the witnesses, they are still factual findings that can only be overturned if they are clearly erroneous. Doe offers no reason to reject these findings.

■ We also agree with the district court that transporting Doe to the park and leaving him handcuffed in the squad car during questioning does not in itself render Doe's *Miranda* waiver involuntary. The officers' conduct raises concerns, particularly in light of their failure to explain to the district court why they questioned Doe in the park rather than at the police station. Be that as it may, in the absence of further evidence that the police acted improperly in soliciting statements from Doe, the setting of this interrogation by itself does not rise to the level necessary to nullify Doe's waiver of his *Miranda* rights. Cf. *Holland v. McGinnis*, 963 F.2d 1044, 1051 (7th Cir.1992) (rejecting a habeas petitioner's claim that his *Miranda* waiver and confession were coerced because he had been beaten by police six hours before), *cert. denied,* 506 U.S. 1082, 113 S.Ct. 1053, 122 L.Ed.2d 360 (1993); *United States v. Koch*, 552 F.2d 1216, 1218–19 (7th Cir. 1977) (holding that the defendant's confession was involuntary because the defendant had been subjected to "exacerbated solitary con-

finement" and released only upon agreeing to cooperate with authorities).

### C. Upward Sentencing Departure for High–Purity Heroin

■ Vincent Balbo testified that the high-purity heroin contained in Doe's package would have generated 2.5 kilograms of low-purity heroin for distribution to users. In calculating Doe's sentence, the district court departed upward by six levels under USSG § 2D1.1 to account for the high purity of the drug.[3] The six-level departure resulted in a base offense level equal to the level Doe would have received with a relevant quantity of 2.5 kilograms of low-purity, street-level heroin.

■ Doe complains that this departure contradicts Congress's directive that drug sentences should depend on the amount or weight of the controlled substance. See Chapman v. United States, 500 U.S. 453, 461, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991) (stating, in discussing the Anti-Drug Abuse Act of 1986, that "[Congress] intended the penalties for drug trafficking to be graduated according to the weight of the drugs in whatever form they were found—cut or uncut, pure or impure, ready for wholesale or ready for distribution at the retail level."). In fact, however, the district court's departure under § 2D1.1 was wholly consistent with this principle. An upward departure under § 2D1.1 may allow the sentencing court to translate high-purity controlled substances into their equivalent weight on the street, as the district court did in this case. Just as "Congress did not want to punish retail traffickers less severely, even though they deal in smaller quantities of the pure drug," Chapman, 500 U.S. at 461, 111 S.Ct. 1919, section 2D1.1 ensures that traffickers above the retail level are not punished less severely merely because they receive the drug in concentrated form, before it is diluted to its street-level weight. Thus, we reject Doe's challenge to the upward departure under § 2D1.1. See also United States v. Connor, 992 F.2d 1459, 1463 (7th Cir.1993) (upholding an upward departure under § 2D1.1 based on the high purity of the cocaine involved).[4]

### D. Perjury Enhancement

Finally, Doe argues that the district court erred when it enhanced his sentence by two levels for obstruction of justice under USSG § 3C1.1. The court based this enhancement on its finding that Doe committed perjury at the suppression hearing. The district court identified the specific testimony supporting this finding, as directed by United States v. Dunnigan, 507 U.S. 87, 95–96, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993) (holding that § 3C1.1 requires the sentencing court to make "independent findings" that the defendant's inaccurate testimony was motivated by a purpose to obstruct justice rather than by "confusion, mistake, or faulty memory"). The court explained to Doe, "You committed perjury during the hearing on your suppression motion when you testified that the interrogation of you included a gun pointed at your head and when you denied that you'd made any statement to the law enforcement officials questioning you immediately after your arrest."

■ We review the district court's factual determinations in support of an enhancement

3. According to the commentary accompanying § 2D1.1, "Trafficking in controlled substances ... of unusually high purity may warrant an upward departure.... The purity of the controlled substance, particularly in the case of heroin, may be relevant in the sentencing process because it is probative of the defendant's role or position in the chain of distribution." USSG § 2D1.1, comment. (n.9).

4. Doe also claims that the Government failed to prove that the shipment he received was unusually pure compared to other shipments of heroin from Vietnam. This is not the relevant comparison. Section § 2D1.1 contrasts "unusually pure narcotics" with the more diluted version distrib-

uted to users: "Since controlled substances are often diluted and combined with other substances as they pass down the chain of distribution, the fact that a defendant is in possession of unusually pure narcotics may indicate a prominent role in the criminal enterprise and proximity to the source of the drugs." USSG § 2D1.1, comment. (n.9). Thus, it is immaterial whether the purity of the shipment in this case was similar to the purity of other shipments from the same source country. The focus, rather, is on the anticipated purity of the controlled substance distributed to customers in relation to the purity of the contraband seized from a defendant.

for obstruction of justice for clear error. *See United States v. Ramunno*, 133 F.3d 476, 480–81 (7th Cir.1998); *United States v. Romero*, 57 F.3d 565, 573 (7th Cir.1995). We have already decided that the court did not commit clear error in believing the police officers' account of the interrogation over the account given by Doe. Doe argues that an enhancement under § 3C1.1 is nevertheless unwarranted because the district court failed to make the requisite findings that his testimony was both willfully misleading and material to the issues at hand.

■ We reject both of these contentions. Although the district court did not employ the word "willful" in making its findings, the court's reasoning plainly reveals its judgment that Doe deliberately gave false testimony. *See United States v. Hickok*, 77 F.3d 992, 1008 (7th Cir.) (holding that willfulness was implicit in the district court's finding of perjury even though the district court did not make an explicit finding to that effect), *cert. denied*, 517 U.S. 1200, 116 S.Ct. 1701, 134 L.Ed.2d 800 (1996); *see also Dunnigan*, 507 U.S. at 95, 113 S.Ct. 1111 ("The district court's determination that enhancement is required is sufficient ... [if] the court makes a finding of an obstruction of, or impediment to, justice that encompasses all of the factual predicates for a finding of perjury."). Immediately after pointing to the specific perjured testimony, the court castigated Doe for another act of intentional duplicity: his carefully documented false identity. Furthermore, the substance of Doe's allegations—that a gun was held to his head and that the police fabricated the statements he allegedly made during the interrogation—is not the kind of testimony about which a defendant could be unintentionally mistaken. *See Dunnigan*, 507 U.S. at 95–96, 113 S.Ct. 1111 (upholding the district court's finding of obstruction of justice "[g]iven the numerous witnesses who contradicted [the defendant] regarding so many facts on which she could not have been mistaken"). As for materiality, nothing could be more material to the issues presented in the suppression hearing than testimony regarding what actually happened during the interrogation in the park. Because the district court's findings satisfy the dictates of *Dunnigan* and are not clearly erroneous, we uphold the two-level enhancement for obstruction of justice.

For the foregoing reasons, we affirm Doe's convictions and sentence.