UNITED STATES of America,
Plaintiff–Appellee,

v.

Larry D. WILSON,
Defendant–Appellant.

No. 90–1987.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 22, 1990.

Decided Jan. 23, 1991.

Richard N. Cox, Asst. U.S. Atty., Office of the U.S. Atty., Danville, Ill., for plaintiff-appellee.

Larry D. Wilson, pro se.

David J. Ryan, Dukes, Martin, Helm & Ryan, Danville, Ill., for defendant-appellant.

Before BAUER, Chief Judge, EASTERBROOK, Circuit Judge, and WILL, Senior District Judge.*

WILL, Senior District Judge.

The police found a gun under Larry Wilson's girlfriend's mattress and as a result,

---

* The Honorable Hubert L. Will of the United States District Court for the Northern District of Illinois, Eastern Division, is sitting by designation.

Wilson, who had three prior convictions, was indicted and tried for unlawful possession of a firearm. The jury returned a guilty verdict and the district court sentenced Wilson to a term of fifteen years, the statutory minimum. 18 U.S.C. § 924(e). Wilson appeals, arguing primarily that the evidence that he possessed the gun was too thin to support a conviction. The evidence was sufficient, and we affirm the judgment. Wilson also argues that his sentence should not have been enhanced on the basis of the prior convictions, which, he says, were unconstitutionally obtained. All three prior convictions stemmed from a single plea agreement and Wilson argues that he took that agreement and tendered the pleas only because his appointed counsel, who thought the agreement was a good one, threatened to withdraw if he persisted in demanding a trial. This is not an unconstitutional "only." Wilson has not credibly demonstrated that he would have insisted on going to trial but for his lawyer's threats. We therefore affirm his sentence as well.

I

Wilson sometimes spent weekends with Anita Townsend and their two children at her apartment (though he had his own place). One Monday morning in February 1989, four Danville police officers showed up at Townsend's apartment, looking for Wilson and carrying a warrant for his arrest. Their instincts were right; Wilson was there. They arrested him and whisked him away. The arrest did not stick. We were told at oral argument that all charges against Wilson connected to the arrest were later dismissed in state court for want of evidence.

With Wilson gone, the police obtained consent from Townsend to search her apartment and in the course of the search found a .38 Colt between the mattress and the boxspring in a bedroom, where they also found some men's clothing (blue jeans and shirts), which may have belonged to Wilson. The Colt was taken to the police crime lab. Fingerprint experts there found a latent "ridge detail" on a groove in the gun and matched the detail to Wilson's left thumb.

That, in sum, was the government's case for § 924 possession against Wilson. There was no direct evidence that the gun in Townsend's apartment belonged to Wilson, no witness testified to having ever seen him with it, and no effort was ever made to match the latent print on the gun with anyone's inked prints except his. No comparison, for example, was ever made with Townsend's prints.

In his defense, Wilson put his own fingerprint expert on the stand, Steven Schachte. Schachte testified that "due to an insufficient amount of clear characteristics," the latent print found on the gun was "inconclusive and non-identifiable." Wilson also called Anita Townsend, who testified that the Colt was hers, that she bought it to protect herself from burglars and that she placed it under the mattress. Townsend, however, was not a good witness. The district judge observed that she "came across as a person who was untruthful and belligerent" and remarked that "[t]he jury obviously reached that conclusion too." Her testimony was impeached by a federal agent, who testified that Townsend had told him earlier, though not under oath, that the gun was not hers, and also by the testimony of a Danville police officer who testified that, on the morning of the search, Townsend told him that the gun was not hers and that she had never seen it before. The Danville officer did not, however, ask Townsend whether the gun belonged to Wilson. Townsend's sister and a girlfriend also testified.

■ The jury might have elected, but didn't, to believe Schachte, instead of the government's crime lab witnesses. And even crediting the crime lab witnesses, the jury might still have found, quite credibly, that the evidence was insufficient to prove possession. But the jury convicted.

The most incriminating evidence of possession was undoubtedly the fingerprint. There were explanations available, fully consistent with innocence, which would have explained the print. Perhaps Wilson brushed his hand against the gun one day

while making the bed. Merely touching would not be possessing it. Perhaps he momentarily grabbed the gun from the children, after finding them playing with it. The possibilities are endless. But after five-and-a-half hours of deliberation no juror found any of these possibilities sufficient to create a reasonable doubt as to Wilson's guilt, and we conclude that a jury could, within the province of rationality, convict Wilson based on the evidence.

The gun was found in an apartment where Wilson sometimes spent the night and where two of his children lived with their mother, who had been his girlfriend. The gun had a print on it and the jury could reasonably conclude that the print was Wilson's. The next step in the chain of proof is the most tenuous but still tenable. A rational jury could determine, on the basis of the evidence and beyond a reasonable doubt, that any gun in Townsend's apartment with Wilson's print on it had been "possessed" by Wilson. It was not improbable that objects found there might be his.[1] Indeed, an already convicted felon might be wise to keep a gun at his girlfriend's apartment rather than at his own, knowing that if the police were to find a gun in her apartment an innocent explanation might be possible, although difficult, but that if the gun was found in his apartment the suggestion of guilt would be nearly overwhelming.

In this very close case, a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

## II

Wilson makes several more arguments. Before trial, he moved to exclude all evidence that the police had arrived at Townsend's apartment with a warrant and arrested him, on grounds that such evidence would be "highly improper and prejudicial." The district judge denied the motion but limited the evidence at trial to testimony that the officers had a warrant for Wilson's arrest, went to Townsend's apartment to arrest him, and did arrest him. The government was not permitted to introduce evidence concerning the nature of the state charges, and no one introduced evidence as to the disposition of those charges. Wilson contends that admitting any of the evidence of the arrest at all was error.

▆▆ We find no abuse of discretion in the judge's decision to let the government tell the jury about the warrant and the arrest. A jury that had not been told about the warrant would have been left scratching its collective head about what the police were doing at Townsend's apartment in the first place. Evidence of the warrant and the arrest were appropriately admitted to put the facts in context. And, in any event, Wilson's criminal past was not news to the jurors. In learning of the federal charge—felon in possession—the jury necessarily learned that Wilson had a prior conviction and, besides, heard that fact yet again after Wilson stipulated to a prior conviction and the stipulation was read aloud. The indictment read to the jury, however, correctly listed only *one* of Wilson's three prior convictions. See *United States v. King,* 897 F.2d 911 (7th Cir. 1990).

▆▆ Wilson also presses arguments relating to three instances of alleged prosecutorial misconduct. First, he complains that the government withheld his fingerprint cards until the day before trial. But he never filed a motion seeking earlier discovery nor for a continuance to allow

---

1. But compare *United States v. Beverly,* 750 F.2d 34 (6th Cir.1984). Beverly was in a friend's kitchen when the police arrived with a search warrant. The police found two guns in a wastepaper basket. The evidence established that Beverly had been standing "close to" the basket and that one of the guns had his prints on it. The government argued that Beverly had "possessed" the gun and tossed it into the trash when the police arrived. Beverly moved for a judgment of acquittal. The district court denied the motion. The Sixth Circuit reversed. "[T]he evidence ... does not establish constructive possession. Instead it establishes only that Beverly was in the kitchen ... that Beverly was standing close to a waste basket which contained two guns, and that Beverly had at some point touched one of the guns." 750 F.2d at 37.

Schachte more time. Schachte expressed a firm opinion at trial and did not indicate that he had had insufficient time to study the prints. Second, the government argued in closing that Schachte's testimony was entitled to little weight since he only examined the prints in the courthouse the morning of trial. Although a little incongruous, given the fact that the government held the prints until the day before trial, that comment did not so infect the proceedings as to deprive Wilson of a fair trial. *United States v. Stillwell*, 900 F.2d 1104, 1112 (7th Cir.1990). Third, the prosecutor referred in closing to a "bonding between Mr. Wilson and Ms. Townsend that was more than occasional and it indicated a closer relationship." Wilson objects to that remark. The basis for it, however, was obvious in the evidence.

### III

■ Wilson's next argument concerns his sentence enhancement under the Armed Career Criminal Act. 18 U.S.C. § 924(e)(1). Prior convictions count towards enhancement under § 924 only if they were constitutionally obtained. Wilson argues that his were not.

Wilson had three prior convictions, the result of a bulk plea agreement that had disposed of the indictments against him in three state prosecutions at once. At the sentencing hearing in this case, he testified that his decision to take the state's package deal in those earlier cases had been coerced by his court-appointed counsel, Michael Clary, who, he said, had threatened to withdraw unless he agreed to plead guilty in all three cases. He also testified that Clary had said that there would be no more continuances and that no other lawyer would be appointed—in essence, that the price for refusing to bend and plead would have been an immediate trial, without counsel, post-haste and pro se.

Clary also testified at the sentencing hearing and described his conversations with Wilson as follows:

> I told [Wilson] I thought that ... he really should take the plea agreement that was being tendered, and he did not

want to do that. I told him that if he persisted and wanted to go to trial that I felt, knowing what I knew about the case, that I didn't think in good conscience I could go ahead and represent him on the case because I thought it was in his best interest to take the plea agreement, and I told him if he wanted to go ahead with the trial that I had to inform the judge that we had a major difference of opinion and I'd have to withdraw, *and he could have an attorney appointed for him* who would have a fresh view and go gung ho with the file.

(Emphasis added).

The district court credited Clary over Wilson and concluded that "Clary [was] saying 'If you don't like what I've done for you, get another lawyer. The court will get you another lawyer.'" We credit the district court's finding, the district court having heard the testimony, that Wilson was never told that he'd be stuck without a lawyer. But Clary's remarks to Wilson amount to a threat to withdraw nonetheless (though the district court thought not), and Wilson contends that his pleas, coerced by that threat, were involuntary, unknowing, and ineffectively counseled. See *Brady v. United States*, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970) (guilty pleas); *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (ineffective assistance); *Hill v. Lockhart*, 474 U.S. 52, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985) (ineffective assistance in guilty plea cases).

There are two strands of argument here—a due process argument, that the pleas were involuntary, and also a sixth amendment argument, that Clary provided ineffective assistance. These arguments are doctrinally distinct. Effective assistance from counsel "within the range of competence demanded of attorneys in criminal cases," *McMann v. Richardson*, 397 U.S. 759, 771, 90 S.Ct. 1441, 1449, 25 L.Ed.2d 763 (1970), will usually guarantee a knowing, intelligent and voluntary plea—but not always.

Suppose defendant A threatens to bump off codefendant B's girlfriend, unless B pleads guilty and "admits" to having acted alone. There are, in this scenario, no sixth amendment problems (at least, so long as B's lawyer knows nothing about A's threat). But B's plea might be open to attack on due process grounds. We say "might" be open to attack because of a threshold question about whether coercion by private actors ever raises due process concerns about the voluntariness of a plea. It's not hard to see that B's plea, following A's threat, is likely to have been involuntary. But due process concerns arise only if there has been state action. And where is the state action when A threatens B or Clary threatens Wilson? Is there any state action?

It would be possible to argue, by analogy to *Shelley v. Kraemer,* 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948), that there is state action to be found in court enforcement of agreements, that every time a court enforces a plea bargain, or perhaps even any private contract, there is state action. We need take no sides in that argument.

█ In the case of plea bargains, there is obvious state action separate from the act of enforcing the "bargain" per se. The result of enforcing a plea bargain is that a defendant is put in custody, and *that* assuredly entails state action. Thus, custody, which depends on a valid plea, supplies the necessary element of state action for Wilson's due process claim based on an allegedly involuntary plea. We do not decide whether there was state action when the state court accepted his pleas. There plainly was state action when he was put in prison as a result of pleading guilty; and he has, therefore, presented cognizable claims, both on sixth amendment and fourteenth amendment grounds, that his pleas were involuntary. It does not matter that

the coercion that he says made the pleas involuntary came from his own lawyer. If Clary coerced him into pleading guilty, making his pleas involuntary, then he suffered a denial of due process, and his fifteen-year sentence, under § 924(e), is invalid.

Admittedly, it is not easy to tell when a plea has been unlawfully coerced. Distinguishing coercion, of the constitutionally offensive kind, from sound anodyne advice, which raises no constitutional concerns but just as surely pressures pleas, is difficult. In any guilty-plea system, pricks, prods, and provocations—whether from a lawyer, a mother, a father, a friend or anybody else—will frequently steer a defendant's thoughts, in that sense "coercing" pleas. But not every piece of advice or pressure from a private party amounts to *unconstitutional* coercion.

█ This case, however, does not force us to test the line between coercion and simple advice or assess when words, which would be unconstitutional if spoken by a prosecutor, might be constitutionally inoffensive if spoken by somebody else. Wilson's case founders before that point. He has not shown, as he had to, that Clary's threats were the reason he decided to plead. *Hill v. Lockhart,* 474 U.S. at 59, 106 S.Ct. at 370 (ineffective assistance) ("The defendant must show that there is a reasonable probability that, *but for* counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.") (emphasis added); *Machibroda v. United States,* 368 U.S. 487, 493, 82 S.Ct. 510, 513, 7 L.Ed.2d 473 (1962) (due process) (A plea is void if it has been "induced by promises or threats which deprive it of the nature of a voluntary act.")

█ Clary put all the screws on. Threatening to withdraw is a drastic tactic and may have been improper.[2] But Clary's

---

**2.** See Alschuler, *The Defense Attorney's Role in Plea Bargaining,* 84 Yale L.J. 1179, 1309–1310 (1975) ("[T]he principle that a defendant should be allowed to choose his own plea does not indicate to a defense attorney how forceful he may properly be in urging a particular plea upon his client. This principle can, however, be given concrete meaning in at least one situation. A defense attorney should neither withdraw nor threaten to withdraw from a case because his client has refused to enter the plea that the attorney has recommended. Professional codes should, in my view, be revised to make this action grounds for professional discipline.")

behavior, as such, is not at issue here. The burden was on Wilson to show that he would have insisted on a trial but for Clary's threats. *Hill v. Lockhart, supra; Machibroda, supra.* Our concern is only with whether Wilson has carried that burden, and he has not.

The likelihood that Wilson would have insisted on a trial but for Clary's threats is small—less than probable. The evidence suggesting that the plea was voluntary is too strong. When he entered his pleas in state court in 1986, Wilson testified under oath that he was satisfied with Clary's representation and that no one had threatened him to force him to plead. He never filed post-conviction motions to void the pleas, on any ground, and not a peep was heard from him on that subject the whole time he was serving his sentence. The voluntariness of the earlier pleas only arose during the sentencing hearing in this case, almost four years later. And for this case, Wilson hired Clary again, even though he says *now* that Clary had forced him to plead against his will to crimes he says he didn't commit. All these facts tend to undermine the plausibility of Wilson's belated attempts to describe his pleas as involuntary. And there is one more fact. The state's offer to dispose of three indictments at once was a good one for Wilson and attractive in its own right. By taking it, Wilson got six years for two robberies and a residential burglary. His exposure was much greater than that, up to 15 years, flat term, on the burglary count alone. Even without Clary's threat, the pressures to take the plea bargain must have been substantial. Wilson's protestations now that his pleas were involuntary are difficult to believe.

There is no indication in the transcript from the plea hearing that Wilson's pleas were unknowing.

## IV

 Wilson's last argument also pertains to his sentence. The statutory minimum sentence for a felon in possession, with three prior convictions, all violent felonies, was 15 years. 18 U.S.C. § 924(e)(1).

Wilson contends that the sentence should have been mitigated to account for the "substantial assistance" he says he provided the government, referencing section 5K1.1 of the sentencing guidelines. That section gives district judges latitude to depart from a guidelines sentence to account for a defendant's cooperation, where the government has filed a motion asking for the departure. The sentence for Wilson's offense, however, was set by statute not the guidelines. See 18 U.S.C. § 924(e) (fifteen-year minimum sentence). See also guidelines section 5G1.1 (conflicts between the guidelines and a statutorily required maximum or minimum are resolved in favor of the statute). There is a statutory parallel to 5K1.1 at 18 U.S.C. § 3553(e), so that the district court could still have reduced Wilson's sentence, notwithstanding that § 924(e) establishes a statutory minimum, if the government had moved for a reduction. See 18 U.S.C. 3553(e) ("Upon motion of the Government," the court may impose a sentence below the statutory minimum to reflect the defendant's "substantial assistance in the investigation or prosecution of another person who has committed an offense."). The government did not move for a reduction, and although Wilson "submits that the Government's failure to make the Motion was unreasonable," the argument is a nonstarter. The government motion requirements in sections 5K1.1 and 3553(e) do not violate due process. *United States v. Lewis,* 896 F.2d 246 (7th Cir.1990); *United States v. Valencia,* 913 F.2d 378, 386 (7th Cir.1990). We note, in addition, that the district court did not believe Wilson's declarations that his cooperation warranted a reduction in sentence and made an express finding that Wilson had not substantially assisted the government. Wilson received the proper sentence.

Because there was sufficient evidence to convict, no deprivation of due process or the right to counsel and no reversible error at trial, Wilson's conviction and sentence are

AFFIRMED.