**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Anthony BRIGHAM, Defendant–
Appellant.**

**No. 92–1236.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 25, 1992.

Decided Oct. 8, 1992.

Barry R. Elden, Asst. U.S. Atty., Ross O. Silverman, Asst. U.S. Atty. (argued), Crim. Receiving, Appellate Div., Chicago, Ill., for plaintiff-appellee.

Marvin Bloom (argued), Chicago, Ill., for defendant-appellant.

Before BAUER, Chief Judge, and POSNER and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

Steep penalties await those who deal in drugs. Buying or selling 10 kilograms of cocaine—even agreeing to do so, without carrying through—means a minimum penalty of 10 years' imprisonment, without possibility of parole. 21 U.S.C. §§ 841(b)(1)(A), 846.

The "mandatory" minimum is mandatory only from the perspective of judges. To the parties, the sentence is negotiable. Did a marginal participant in a conspiracy really understand that a 10–kilo deal lay in store? A prosecutor may charge a lesser crime, if he offers something in return. Let's make a deal. Does the participant have valuable information; can he offer other assistance? Congress authorized prosecutors to pay for aid with sentences below the "floor." 18 U.S.C. § 3553(e); Fed.R.Crim.P. 35(b). See also U.S.S.G. § 5K1.1; *Wade v. United States,* —— U.S. ——, 112 S.Ct. 1840, 118 L.Ed.2d 524 (1992). Let's make a deal.

Bold dealers may turn on their former comrades, setting up phony sales and testifying at the ensuing trials. Timorous dealers may provide information about their sources and customers. Drones of the organization—the runners, mules, drivers, and lookouts—have nothing comparable to offer. They lack the contacts and trust necessary to set up big deals, and they know little information of value. Whatever tales they have to tell, their bosses will have related. Defendants unlucky enough to be innocent have no information at all

and are more likely to want vindication at trial, losing not only the opportunity to make a deal but also the 2–level reduction the sentencing guidelines provide for accepting responsibility.

Mandatory minimum penalties, combined with a power to grant exceptions, create a prospect of inverted sentencing. The more serious the defendant's crimes, the lower the sentence—because the greater his wrongs, the more information and assistance he has to offer to a prosecutor. Discounts for the top dogs have the virtue of necessity, because rewards for assistance are essential to the business of detecting and punishing crime. *United States v. Mittelstadt*, 969 F.2d 335, 337 (7th Cir. 1992). But what makes the post-discount sentencing structure topsy-turvy is the mandatory minimum, binding only for the hangers on. What is to be said for such terms, which can visit draconian penalties on the small fry without increasing prosecutors' ability to wring information from their bosses? *Report of the Federal Courts Study Committee* 133–34 (1990); United States Sentencing Commission, *Special Report to the Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System* (1991); Barbara S. Meierhoefer, *The General Effect of Mandatory Minimum Prison Terms* (Federal Judicial Center 1992); Stephen J. Schulhofer, *Assessing the Federal Sentencing Process: The Problem is Uniformity, not Disparity*, 29 Am.Crim.L.Rev. 833, 852–57 (1992).

Our case illustrates a sentencing inversion. Such an outcome is neither illegal nor unconstitutional, because offenders have no right to be sentenced in proportion to their wrongs. *Chapman v. United States*, —— U.S. ——, —— – ——, 111 S.Ct. 1919, 1928–29, 114 L.Ed.2d 524 (1991). Still, meting out the harshest penalties to those least culpable is troubling, because it accords with no one's theory of appropriate punishments.

Agents of the Drug Enforcement Agency learned from an informant that Craig Thompson was in the market to buy 10 kilograms of cocaine. The DEA's under-cover agents feigned willingness to supply him. During negotiations, Thompson said that he had just sold 17 kilograms and needed 10 more that very day to tide his organization over until the arrival of a shipment that he was expecting. Thompson and the agents did not trust one another. Jeffrey Carter, one of Thompson's goons, searched an agent; the agent's gun, normal in the business, did not trouble Carter, but a transmitter or recorder would mean big trouble. Carter was not very good at his job; he didn't find the concealed recorder. Thompson ultimately agreed to pay $30,000 per kilogram, a premium price for quick service. After the agents let on that they didn't trust Thompson any more than Thompson trusted them, Thompson agreed to let the agents hold his Rolls Royce as collateral until payment. In the agents' presence, Thompson called Tyrone Amos and told him to pick up "ten of those things today" at a suburban motel. Thompson and Carter would hand over the Rolls in a different suburb.

At the appointed time, less than five hours after the agents first met Thompson, one team descended on a restaurant to receive the Rolls Royce and another decamped to the motel to "deliver" the cocaine. Amos arrived at the motel in a car driven by Anthony Brigham. Amos and the agents at the motel had a conversation; Brigham stayed in the car. Carter had not appeared at the restaurant with the Rolls Royce, so everyone settled down to wait. Brigham looked around the parking lot but scrunched down in his seat when the agents' Corvette drove slowly by. At the restaurant Thompson and the agents discussed future deals of 50–100 kilograms per month. At the motel Brigham paced nervously in the lobby. After touring the parking lot again, lingering over the Corvette, Brigham joined Amos at a nearby gas station, where Amos placed a phone call. The two had a conversation and returned to the motel, where Amos told the agents that Carter and the Rolls were still missing. While Amos and one agent were dining together some distance from the motel, Thompson paged Amos with news that the Rolls had arrived.

Back at the motel, the agents went through the motions of delivering cocaine. As Amos headed for the agents' car to retrieve the drug from the trunk, Brigham moved his car to a location from which he could keep the delivery in sight. But there was no cocaine. Before Amos could open the trunk other agents moved in, arresting Amos and Brigham, just as they pinched Thompson and Carter at the restaurant.

All but Brigham pleaded guilty and provided valuable assistance to prosecutors. All but Brigham were sentenced to less than the "mandatory" minimum. Thompson received 84 months' imprisonment and Amos 75 months', after the prosecutor made motions under § 3553(e). Carter, who was allowed to plead to a charge that did not carry a minimum term, received 4 years' probation, 4 months of which were to be in a work-release program run by the Salvation Army. That left Brigham, who went to trial, was convicted, and received the "mandatory" term of 120 months' imprisonment.

Was the evidence sufficient? Appellate judges do not serve as additional jurors. After a jury convicts, the question becomes whether any sensible person could find, beyond a reasonable doubt, that the defendant committed the crime. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). That is a steep burden, for 12 persons, presumably sensible and having a more direct appreciation of the evidence than the written record affords to appellate judges, have unanimously found exactly that. See *United States v. Durrive*, 902 F.2d 1221, 1225 (7th Cir.1990).

Brigham emphasizes that "mere" presence at the scene of a crime does not implicate the bystander in that offense. E.g., *United States v. Penagos*, 823 F.2d 346 (9th Cir.1987). Conspiracy is agreement, *United States v. Sassi*, 966 F.2d 283 (7th Cir.1992), and what proof of agreement did the prosecutor present? Brigham arrived with Amos, conferred with Amos, and was in position to watch an exchange occur. No one testified that Brigham had any role in the exchange or Thompson's organiza-tion. Although the prosecutor portrayed Brigham as a lookout, he asks: What kind of lookout would be unarmed, without radio, pager, cellular phone, or any other way to give or receive alerts? What counter-surveillance operative would hunker down in the car rather than keep a hawk-eyed watch? Thompson, Carter, and Amos, who reaped rewards for their assistance, were conspicuously absent at Brigham's trial. Had they no evidence to offer against him?

No one questions the rule that "mere presence" at the scene of a crime does not prove conspiracy. "Mere" presence differs from, say, "revealing" presence. Like many a weasel word, "mere" summarizes a conclusion rather than assisting in analysis. When the evidence does not permit an inference that the defendant was part of the criminal organization, the court applies the label "mere presence." So we must examine the evidence, taking inferences in the light most favorable to the jury's verdict, rather than resting content with slogans.

Brigham shows up on short notice with Amos, who the jury could conclude was there to receive 10 kilograms of cocaine from strangers whom Thompson and Amos do not trust. Is Amos likely to come alone? Is a companion apt to be ignorant of the nature and risks of the transaction? See *United States v. Rodriguez*, 975 F.2d 404, 411–12 (7th Cir.1992); *United States v. Perry*, 747 F.2d 1165, 1169 (7th Cir.1984). For almost three hours Brigham remains at the motel, generally observant and generally nervous; he follows Amos to a pay phone where a telephone call and conversation ensue. Amos reveals the contents of this conversation to the agents; the jury could conclude that he revealed it to Brigham too. While Amos and an agent go to dinner, Brigham keeps watch. After Amos returns, eye contact and a nod from Amos lead Brigham to take up position where he can watch the trunk of the agents' car. Just what *was* Brigham doing for three hours in the lobby and parking lot of the motel, if not assisting Amos? He was not exactly passing through while a drug deal went down around him. Brigham did not testify, and his lawyer offered no hypothe-sis at trial. At oral argument of this ap-

peal the best his counsel could do was to suggest that Brigham might have believed that Amos was picking up counterfeit money rather than drugs. Tell us another! The jury was entitled to conclude that Brigham knew about, and joined, a conspiracy to distribute cocaine.

Thin the evidence was, but it was also sufficient. Evidence at sentencing shows that the jury drew the right inference. Amos related that he brought Brigham as a lookout. Brigham told the prosecutor that he was part of the organization and had been involved in some big-stakes transactions. But he was unable to provide enough information to induce the prosecutor to make the motion under § 3553(e) that unlocks the trap door in the sentencing "floor." Pleading guilty would have produced the 10–year minimum term, so Brigham went to trial; he had nothing to lose and some chance of being acquitted. The evidence at sentencing showed that Brigham knew that Thompson's organization dealt in multi-kilogram quantities, which supports the judge's conclusion that Brigham qualifies for the 10–year minimum.

All that remains is Brigham's argument that the judge should have invoked U.S.S.G. § 5K2.0 to give him a break. Section 5K2.0 describes appropriate departures *from the guidelines,* but Brigham needed a departure from a minimum sentence prescribed by statute. That was available only on motion of the prosecutor under § 3553(e). *United States v. Wilson,* 922 F.2d 1336, 1342 (7th Cir.1991). See also *United States v. Smith,* 953 F.2d 1060, 1063–64 (7th Cir.1992). Brigham does not contend that in declining to make the motion the prosecutor violated the Constitution, and under the approach of *Wade* no such argument would be tenable.

Wise exercise of prosecutorial discretion can prevent egregious sentencing inversions. How that discretion is to be exercised is a subject for the political branches. *United States v. Schwartz,* 787 F.2d 257 (7th Cir.1986); *United States v. Stanley,* 928 F.2d 575 (2d Cir.1991). Brigham joined the conspiracy and received a sentence au-

thorized by Congress. His judicial remedies are at a close.

AFFIRMED.

BAUER, Chief Judge, dissenting.

I respectfully dissent. Taking all the evidence as described in the majority opinion as absolutely true, and viewing it in the light most favorable to the government, I still do not find that any sensible juror could find Brigham guilty of the crime of conspiracy beyond a reasonable doubt. At oral argument, counsel for Brigham could only suggest, in answer to a question from the bench as to what explanation he could give for Brigham's actions on the day in question, "that Brigham might have believed that Amos was picking up counterfeit money rather than drugs." An unbelievable scenario. The fact is, no one testified as to what exactly Brigham was doing or why he was doing it; no one, in spite of the marvelous totally cooperating witnesses who, if the government's theory is correct, could have nailed Brigham's hide to the jailhouse wall. But they didn't. And it is not Brigham's missing explanation that is fatal; it is the government's inability to explain that creates the problem.

Tell us another, indeed, but only if it is the government tale; the accused has absolutely no burden to explain anything. The government accuses, the defendant says "prove it," and the government says the suspicious activity is enough to convince and convict.

And so it proved.

I would have directed a verdict of "not guilty" had I been the trial judge and I construe my role in review to be the same. I do not believe the evidence sufficient to convince a sensible juror of proof beyond a reasonable doubt. The existence of cooperating witnesses who knew all and told nothing virtually implies the missing witness analysis: you had the control, you didn't produce, I infer the testimony would have been adverse to you.

I would reverse.