In the

# United States Court of Appeals

## For the Seventh Circuit

No. 06-1695

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ROY GLOVER,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 CR 940—**Blanche M. Manning**, *Judge.*

ARGUED FEBRUARY 7, 2007—DECIDED MARCH 14, 2007

Before FLAUM, ROVNER, and EVANS, *Circuit Judges.*

FLAUM, *Circuit Judge.* A jury convicted Roy Glover of
two drug offenses and two gun offenses: (1) possession
with intent to distribute heroin and cocaine, in violation
of 21 U.S.C. § 841(a)(1); (2) possession of heroin and
cocaine within 1,000 feet of a school, in violation of 21
U.S.C. §§ 841(a)(1) and 860(a); (3) possession of a firearm
in furtherance of, and during and in relation to a drug
trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A);
and (4) knowingly possessing a firearm and ammunition,
having been previously convicted of a crime punishable
by a term of imprisonment exceeding one year, in violation
of 18 U.S.C. § 922(g). On February 28, 2006, the district
court sentenced Glover to 360 months' imprisonment

after determining that he was a career offender. Glover alleges numerous errors related to his conviction and sentence. For the following reasons, we affirm.

## I. Background

On June 23, 2004, around 10:00 p.m., Chicago police officers were conducting surveillance of street activity in the 4200 block of West Adams Street, an area known for drug crimes. Officers John Killackey and Sean Pickett saw Roy Glover standing across the street from an elementary school and decided to set up surveillance in some nearby bushes. Over the next fifteen minutes, the officers observed four unidentified individuals approach Glover and hand him something that he held up to examine. Each time, Glover walked a few steps away and retrieved a plastic bag from the ground, took out at least one small object, and handed it to the individual.

Killackey and Pickett radioed two other police officers, Daniel Bora and Humberto Munguia, and directed them to arrest Glover for suspected drug dealing. When the two responding officers pulled up in unmarked vehicles, Glover turned and ran. As Bora gave chase, Glover fled down a gangway towards a basement apartment at 4242 W. Adams. Bora saw Glover reach toward his waistband and throw an object away from his body. Bora heard the clink of metal hitting the ground. Glover then entered the basement apartment and closed the door behind him. Bora retrieved a semi-automatic firearm from the ground and arrested Glover in the basement apartment. At the time of arrest, Glover possessed four live rounds and $80 in cash.

While Bora chased and apprehended Glover, Pickett recovered the plastic bag from which Glover had been retrieving items. The plastic bag contained two smaller

bags, one of which contained 39 capsules of cocaine base, weighing 3.3 grams in total. The second small bag contained 14 tinfoil packets of heroin mixtures, weighing 2.1 grams altogether.

At trial, in addition to the testimony of the responding officers, the government presented expert testimony from a Chicago Police Department evidence technician, Jane Michalik. Michalik testified that she tested the gun, bullet, and magazine recovered at the scene for fingerprints. Michalik recovered one partial print, but it was not suitable for comparison. Nevertheless, Michalik explained that such an outcome is not unusual—fingerprints are rarely obtained from guns due to various factors like sweating and the weather. On cross examination, Michalik conceded that she was unaware of whether Glover was sweating or what the weather conditions were on the night of Glover's arrest.

The government also presented expert testimony from Robert Coleman, a DEA task force officer. Coleman testified that he had been involved in hundreds of drug investigations, which had honed his expertise on the methods and practices of drug dealers. He said that street level drug dealers typically sell very small quantities of cocaine and heroin, which can be packaged in capsules, bottle caps, corner cut baggies, or foils. Coleman also observed that even small amounts of drugs, as in Glover's case, can be distributed if packaged in small enough quantities. He explained that street dealers often maintain small stashes of drugs nearby for resupply, rather than carrying all of their drugs with them. Finally, Coleman testified that firearms are common "tools of the trade" for drug dealers.

Glover's neighbor and girlfriend testified on his behalf. The neighbor attempted to discredit the officers' version of events by casting doubt on whether the officers had

conducted surveillance from the yard as they had claimed. The neighbor testified that he owned two dogs that barked loudly whenever anyone entered his yard. Although the neighbor specifically recalled the night of Glover's arrest, he did not remember hearing his dogs bark. Glover's girlfriend testified about the officers' entry into the apartment she shared with Glover on the night of his arrest. She also testified about Glover's employment history, noting that he had worked for their landlord and for Comcast Cable.

During closing arguments, the prosecutor remarked on Glover's employment history. Specifically, he pointed out that Glover had subpoena power and could have obtained documents related to his employment at Comcast rather than relying on his girlfriend's testimony. Glover objected to the remark, and the judge sustained the objection. The prosecutor continued, noting that no one from Comcast had testified. Glover again objected, and the judge again sustained the objection. The judge then instructed the jury to disregard the remarks, emphasizing that the government retained the burden of proof.

After closing arguments, the judge provided the jury with instructions. Glover requested a "mere presence" instruction, which would have informed the jury that a defendant's knowledge that a crime is being committed in his presence is insufficient to support a conviction. However, the judge refused to tender the instruction, concluding that the evidence presented did not warrant it. The jury returned a guilty verdict on all four counts contained in the indictment.

Between Glover's trial and sentencing, the probation office prepared a presentence investigation report ("PSR") which concluded that Glover was a career offender under U.S.S.G. § 4B1.1(a). The probation office based its conclusion on two prior convictions: a 1984 murder conviction

when Glover was 17 and a 1991 conviction for the unlawful possession of a weapon by a person in prison. Glover objected to the PSR's conclusion that he was a career offender, but the district court agreed with the PSR. Consequently, Glover's criminal history level increased from a 4 to a 6, yielding an offense level of 28 and a recommended sentence range of 360 months to life in prison. The district court sentenced Glover to 360 months in prison. Glover appeals his conviction and sentence.

## II. Discussion

Glover raises multiple issues related to both his conviction and sentence. First, he contends that the trial court improperly admitted Michalik's and Coleman's expert testimony. Second, he claims that the district court erred in refusing to provide the jury with a mere presence instruction. Third, he asserts that the prosecutor's improper remarks during closing argument warranted a new trial. As to his sentence, Glover argues that he should not have been classified as a career offender, that this Court should revisit its presumption that guidelines sentences are reasonable, and that his sentence was unreasonable in any case.

### A. Expert Testimony on Practices of Street Level Drug Dealers

Glover asks this Court to reverse his conviction because the trial court improperly allowed Officer Coleman to testify as an expert on the practices of street level drug dealers. Glover argues that Coleman's testimony was irrelevant because the jury did not need an expert to conclude that the drugs were packaged for distribution. Furthermore, Glover continues, Coleman's testimony violated Federal Rule of Evidence 704(b) because he made

a final conclusion or inference about Glover's mental state, i.e., what Glover intended to do with the drugs. We review the trial court's admission of Coleman's expert testimony for an abuse of discretion. *See United States v. Parra*, 402 F.3d 752, 758 (7th Cir. 2005).

This Circuit repeatedly has approved expert police testimony about the characteristics of drug dealers. *See, e.g.*, *United States v. Love*, 336 F.3d 643, 646-48 (7th Cir. 2003); *United States v. Cruz-Velasco*, 224 F.3d 654, 659-61 (7th Cir. 2000) (collecting cases); *United States v. Lipscomb*, 14 F.3d 1236, 1239-40 (7th Cir. 1994) (collecting cases). Given that Glover was being tried for selling drugs on the street, testimony regarding the practices of street level drug dealers was unquestionably relevant. *See, e.g.*, *United States v. Sanchez-Galvez*, 33 F.3d 829, 832 (7th Cir. 1994) ("[B]ecause the clandestine nature of narcotics trafficking is likely to be outside the knowledge of the average layman, law enforcement officers may testify as experts in order to assist the jury in understanding these transactions.").

Glover's next claim—that Coleman improperly opined on Glover's mental state—is governed by our decision in *Lipscomb*:

> [W]hen a law enforcement official states an opinion about the criminal nature of a defendant's activities, such testimony should not be excluded under Rule 704(b) as long as it is made clear, either by the court expressly or in the nature of the examination, that the opinion is based on the expert's knowledge of common criminal practices, and not on some special knowledge of defendant's mental processes. Relevant in this regard, though not determinative, is the degree to which the expert refers specifically to the 'intent' of the defendant.

14 F.3d at 1242-43. In this case, Coleman made no reference to Glover's "intent," and the structure of his examination made clear that he was speaking generally about the practices of street level drug dealers, not specifically about Glover. Indeed, the district court instructed the jury to that effect. Thus, the district court's decision to admit Coleman's testimony was within its discretion.

Glover also contends that even if Coleman's testimony was otherwise admissible, its probative value was substantially outweighed by the danger of unfair prejudice. This Court has previously upheld the admission of similar testimony against such an objection. *See, e.g.*, *United States v. Brown*, 7 F.3d 648, 654-55 (7th Cir. 1993); *United States v. Foster*, 939 F.2d 445, 452 (7th Cir. 1991). Nevertheless, as *Foster* instructed, we will freshly assesses the balance between probative value and unfair prejudice in this case. *Id.*

A court should exclude evidence "if its probative value is substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403. Evidence is unfairly prejudicial if it has "an undue tendency to suggest decision on an improper basis, commonly though not necessarily, an emotional one." Advisory Committee's Notes on Fed. R. Evid. 403. With regard to expert testimony, relevant factors include (1) whether the expert witness was also an eyewitness or involved in the defendant's arrest; (2) whether cautionary instructions were given; and (3) whether the defense had a full opportunity to cross-examine the expert. *United States v. Doe*, 149 F.3d 634, 637-38 (7th Cir. 1998).

In light of these factors, the district court did not abuse its discretion by admitting Coleman's testimony. First, Coleman was not an eyewitness nor was he involved in Glover's arrest. Second, the district court instructed the jury that Coleman had no special knowledge of Glover's mental processes or intent. Third, Glover had an opportu-

nity to cross-examine Coleman. In short, none of Glover's objections to Coleman's testimony warrant reversal.

## B. Expert Testimony of Fingerprint Technician

Glover next challenges the district court's admission of Michalik's testimony as unreliable, irrelevant, and unfairly prejudicial. We review whether the district court correctly followed the procedures required by Federal Rule of Evidence 702 de novo, but once we determine those procedures were followed, we review decisions to admit or exclude expert testimony for abuse of discretion only. *See Parra*, 402 F.3d at 758.[1]

Before permitting Michalik to testify in front of the jury, the district court conducted voir dire to determine whether her testimony should be admitted. After hearing arguments from both sides, the district court considered Michalik's qualifications and determined that her testimony would assist the jury. Accordingly, the district court fulfilled its gatekeeping function under Federal Rule of Evidence 702.

Because the district court followed the procedures outlined in Federal Rule of Evidence 702, we consider only whether the court abused its discretion in admitting Michalik's testimony. Expert testimony is admissible if

---

[1] The government contends that we should review the admission of Michalik's testimony for plain error because Glover did not specifically object to her qualifications as an expert. Because Glover objected to Michalik's testimony altogether and attempted to discredit her expertise during voir dire, he sufficiently preserved his arguments on appeal. *See, e.g.*, *United States v. Ortiz*, 431 F.3d 1035, 1038 (7th Cir. 2005) (recognizing that we construe waiver/forfeiture principles liberally in favor of criminal defendants).

it is both relevant and reliable. Fed. R. Evid. 702. Expert testimony is reliable only if offered by "a witness qualified as an expert by knowledge, skill, experience, training, or education," and "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." *Id.* Michalik was an eighteen year veteran of the Chicago Police Department who had been an evidence technician since 1997. Before becoming an evidence technician, she completed additional training in crime scene processing. Moreover, this Court has long accepted the scientific validity of fingerprint testing in general. *See United States v. Havvard*, 260 F.3d 597, 600-01 (7th Cir. 2001). Accordingly, the district court did not abuse its discretion by finding that Michalik was a reliable expert.

Glover next contends that Michalik's testimony that fingerprints are rarely recovered from firearms is not relevant. The strongest support for Glover's position, although he does not cite the case, is *United States v. Paladino*, in which a police officer, testifying as an expert, noted that "it was common to be unable to find usable fingerprints 'at a crime scene or on an object.'" 401 F.3d 471, 477-78 (7th Cir. 2005). The issue in *Paladino* was whether the trial judge's comment on that testimony improperly signaled to the jury that the defendant was guilty. *Id.* In addressing the question, the Court commented:

> What this line of inquiry had to do with [the defendant's] guilt is obscure. That there was no fingerprint evidence meant simply that there was no fingerprint evidence. Had [the defendant's] fingerprints been found on the gun, this would have helped the government and if someone else's fingerprints had been found on the gun, this would have helped [the defen-

dant] . . . . Since no fingerprints were found, neither side was helped; and we can't see what difference it makes whether failure to find fingerprints on a gun is common or uncommon. In fact it is extremely common: 'successful development of latent prints on firearms is difficult to achieve. In reality, very few identifiable latent prints are found on firearms, a fact that has been discussed in both literature and the judicial system.' Clive A. Barnum & Darrell R. Klasey, 'Factors Affecting the Recovery of Latent Prints on Firearms,' *Prosecutor,* Jan./Feb.1998, p. 32.

*Id.* at 478. This dicta could be read to suggest that testimony like Michalik's has limited probative value. In this case, however, the testimony helped rebut Glover's argument that the lack of fingerprints indicated innocence. It assisted the jury in understanding that, despite what they might see on popular television crime shows, certain objects are not particularly conducive to finding prints. Glover did not have an opportunity to wipe his prints from the gun, nor was there evidence that he wore gloves. Without Michalik's testimony, the jury may not have understood how Glover could have possessed the weapon without leaving prints.

Glover contends that even if Michalik's testimony was relevant, it was unfairly prejudicial and the trial court should have excluded it under Federal Rule of Evidence 403. Specifically, Glover asserts that Michalik's testimony "added undeserved credibility to her unsuccessful and perhaps even incompetent efforts" to recover prints.[2] In

---

[2] According to Glover, Michalik's assertion that fingerprints are rarely recovered from firearms is belied by a number of cases in which this Court affirmed convictions based on latent fingerprints recovered from firearms. *See, e.g., United States v.*

(continued...)

addition, he posits that Michalik's testimony that sweat, weather, and the handling of the gun could have impacted whether prints were recoverable requires no expertise. *See* Fed. R. Evid. 702, Advisory Committee Notes ("There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine . . . the particular issue without enlightenment from those having a specialized understanding of the subject . . . ."). We disagree, however, for the same reason that we find the testimony relevant—the average layperson might expect a gun to bear fingerprints if it was handled without gloves. Moreover, the jury was aware of the limits of Michalik's testimony because Glover's cross-examination highlighted that she did not know the conditions under which the weapon was recovered.

Glover concludes that dressing up Michalik's testimony as expertise unfairly elevated its importance, thus prejudicing him. We reject this argument as well. Once again, the factors from *Doe* support the trial court's admission of the testimony. Though Michalik's dual role as evidence technician on Glover's case and expert on the success of latent fingerprint recovery from firearms heightened the risk of prejudice, the district court provided the jury with cautionary instructions, and Glover's counsel cross-examined Michalik extensively.

---

[2] (...continued)
*Bowman*, 353 F.3d 546 (7th Cir. 2003); *United States v. Havvard*, 260 F.3d 597 (7th Cir. 2001); *United States v. Wilson*, 922 F.2d 1336, 1338-39 (7th Cir. 1991). Although fingerprint experts testified about recovering latent prints from firearms in all of these cases, none of the experts testified about their relative success in recovering fingerprints from firearms. In short, these cases demonstrate only that evidence technicians sometimes recover fingerprints from firearms, an unsurprising proposition and one that is consistent with Michalik's testimony.

### C.   Mere Presence Instruction

Glover also maintains that the district court improperly refused to give the jury a mere presence instruction. Seventh Circuit pattern instruction 5.11 provides that "a defendant's presence at the scene of a crime and knowledge that a crime is being committed is not alone sufficient to establish the defendant's guilt." Glover argues that the instruction was consistent with his theory that he was merely present on the street and that the officers did not see him engage in any criminal activity. We review a refusal to give a theory of defense instruction de novo where the defendant objected below. *United States v. Baker*, 438 F.3d 749, 758 (7th Cir. 2006).

In this Circuit, a defendant requesting a mere presence instruction must identify evidence consistent with a theory of mere presence. *See id.*; *United States v. Robinson*, 96 F.3d 246, 251 (7th Cir. 1996); *United States v. Tringali*, 71 F.3d 1375, 1380 (7th Cir. 1995). Here, Glover's defense did not suggest he was standing around while others engaged in criminal activity—the typical scenario in which a mere presence instruction is warranted. Consequently, the district court did not err by refusing the instruction.

Even assuming that the trial court should have given the instruction, any error was harmless. This Court observed in *Robinson* and *Tringali* that other instructions indicating that presence alone is insufficient for conviction can cure any deficiency caused by not giving a mere presence instruction. In this case, the jury was instructed that to find Glover guilty, they had to find that he knowingly possessed the firearm and drugs. Given these instructions, no reasonable jury could have convicted Glover merely for being in the vicinity of illegal objects.

### D. Prosecutor's Closing Remarks

Glover further argues that the prosecutor's improper closing remarks warranted a new trial. We review the district court's refusal to grant a new trial for abuse of discretion. *United States v. Alexander*, 163 F.3d 426, 429 (7th Cir. 1998).

Glover twice objected to the prosecutor's remarks about his employment with Comcast and the district court twice sustained his objection, instructing the jury to disregard the remarks and emphasizing that the government retained the burden of proof. Nonetheless, Glover contends that the comments were so prejudicial that the district court abused its discretion when it refused to grant Glover's request for a mistrial.

Whether the district court should have granted a mistrial depends on a two part inquiry: 1) whether the prosecutor's arguments, viewed in isolation, were improper; and 2) whether in light of the record, the remarks deprived Glover of a fair trial. *See United States v. Cassano*, 372 F.3d 868, 879 (7th Cir. 2004). The government contends that the comments were proper and that Glover received a fair trial.

If the evidence at issue does not implicate a defendant's right against self-incrimination, and the jury has been properly instructed as to the burden of proof, a prosecutor may comment on a defendant's failure to present evidence contradicting the government's proof at trial. *See United States v. DiCaro*, 852 F.2d 259, 263 (7th Cir. 1988) (holding that a prosecutor may comment on a defendant's failure to call an alibi witness). Likewise, the government may emphasize the weakness of the case that the defense presents. *See, e.g.*, *United States v. Snook*, 366 F.3d 439, 444-45 (7th Cir. 2004); *United States v. Xiong*, 262 F.3d 672, 675 (7th Cir. 2001). Additionally, at least two of our sister circuits have held that a prosecutor may

highlight weaknesses in the defense case by pointing out the absence of supporting documents. *See United States v. Exarhos*, 135 F.3d 723, 728 (11th Cir. 1998) (holding that prosecutor's comment on the absence of receipts was warranted by "[d]efense counsel's suggestion that the defendants were involved in a legitimate business"); *United States v. Brennan*, 994 F.2d 918, 926-27 (1st Cir. 1993) (holding that a prosecutor's comments regarding a defendant's failure to produce documents corroborating a defense theory are proper if they are limited to assailing the strength or plausibility of the proffered theory). These cases highlight the broad range of comments a prosecutor may make about a defendant's case.

Glover relies on several cases in which courts deemed prosecutorial remarks improper, but those cases are distinguishable. For example, in *United States v. Cunningham*, we concluded that the following closing remarks were improper: "[C]ollectively you can go back there and stop [the defendants]. You can make sure that [the victim] isn't going to get beat up again. Heaven forbid, for the witnesses that came in this courtroom the last couple of days if these guys are found not guilty. Heaven forbid. Don't let that happen . . ." 54 F.3d 295, 300-01 (7th Cir. 1995). Likewise, in *Bates v. Bell*, the prosecutor argued to the jury: "If you, based on the law and the facts of this case, choose not to execute the defendant, you have passively issued a warrant of execution for someone else." 402 F.3d 635, 642 (6th Cir. 2005); *see also Moore v. Morton*, 255 F.3d 95, 101 (3d Cir. 2001) (holding that the following argument from prosecution constituted error: "The last thing I have to say is that if you don't believe [M.A.] and you think she's lying, then you've probably perpetrated a worse assault on her"). The improper comments in cases above attempted to manipulate the conscience of the juries, warning them of dire consequences should they acquit the defendants. By contrast, the

prosecutorial comments in this case related directly to the evidence produced at trial and did not encourage the jury to convict Glover based on an emotional response.

Even assuming that the government's comments were improper, Glover is entitled to a new trial only if he demonstrates that the "prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). In determining whether prosecutorial misconduct deprived a defendant of a fair trial, we consider the nature and seriousness of the prosecutorial misconduct, whether defense counsel invited the prosecutor's remarks, the adequacy of the trial court's instructions to the jury, whether the defense was able to counter the improper arguments through rebuttal, and the weight of the evidence against the defendant. *Cassano,* 372 F.3d at 879.

Here, the prosecutor's comments did not implicate the core issue of Glover's guilt or innocence. Rather, Glover's employment status was probative only of his motivation for selling drugs. Moreover, while we question whether an earlier, unrelated reference to Glover's subpoena power invited the prosecutor's remarks, all other factors weigh against Glover. The judge instructed the jury to disregard the comments, emphasized that closing arguments were not evidence, and reiterated that the burden of proof remained with the government. Additionally, Glover responded to the prosecutor's comments in his own closing statements. Finally, the evidence against Glover, which included the testimony of several police officers as well as physical evidence recovered at the scene, was substantial. In short, the trial court did not abuse its discretion in denying Glover's motion for a mistrial.

**E.  Career Offender Classification**

Glover next questions the district court's determination that he qualified for sentencing as a career offender under § 4B1.1 of the sentencing guidelines. We review findings of fact and applications of the guidelines for clear error. *See, e.g.*, *United States v. Stitman*, 472 F.3d 983, 986 (7th Cir. 2007). We review de novo questions of law involving the interpretation of a provision of the guidelines. *Id.* Section 4B1.1 states:

> (a) A defendant is a career offender if (1) the defendant was at least eighteen years old at the time the defendant committed the instant offense of conviction; (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense.

In this case, Glover's career offender status was based on two prior felony convictions for violent crime, specifically murder and possession of a weapon in prison. Although we have held that mere possession of a weapon is not a crime of violence, *see United States v. Chapple*, 942 F.2d 439, 442 (7th Cir. 1991), we have also said that the possession of a weapon in prison, in and of itself, implies a violent act. *United States v. Vahovik*, 160 F.3d 395, 397 (7th Cir. 1998).

Glover contends that the district court's finding that he was a career offender constituted impermissible judicial factfinding in violation of *Booker* and *Apprendi*. This Court has observed that *Booker* does not affect 28 U.S.C. §994(h), which calls for career offenders to be sentenced at or near the statutory maximum. *See United States v. Woodard*, 408 F.3d 396, 399 (7th Cir. 2005). Nor does the district court's determination that Glover was a career offender violate *Apprendi*, which does not apply to prior

convictions. 530 U.S. 466, 488-90 (2000) (specifically excluding prior convictions from the requirement that sentence-enhancing facts be proven beyond a reasonable doubt). Moreover, we have said that the career offender rules pose legal rather than factual issues for a sentencing judge, which removes the rules from the reach of *Apprendi* and *Booker* altogether. *See Woodard*, 408 F.3d at 399. In short, the district court did not err by classifying Glover as a career offender for sentencing purposes.

## F.   Reasonableness of Sentence

Finally, Glover argues that his sentence, by failing to account for mitigating factors, ignores relevant provisions of 18 U.S.C. § 3553.[3] Prior to sentencing Glover, the district court elicited and considered his written submissions detailing mitigating circumstances that the court should take into account. Glover's written submissions included information on his father's violent death when Glover was five-years-old, the murder of his stepbrother, Glover's lack of a male role model, his association with "a bad crowd," and his two children. After hearing arguments from both sides, the district court imposed a sentence of 360 months, the low end of the guidelines range. The district court noted that Glover's arguments in mitigation did not dissuade it from a guidelines sentence because, based on Glover's history and characteris-

---

[3] Glover also urges us to abandon our presumption that a properly calculated guidelines sentence is reasonable, claiming that the presumption is both unwarranted and inconsistent with the Supreme Court's holding in *United States v. Booker*, 543 U.S. 220 (2005). We decline to revisit the issue at this time, particularly in light of the Supreme Court's pending decisions in *Rita v. United States*, No. 06-5754, and *Claiborne v. United States*, No. 06-5618, which were argued on February 20, 2007.

tics, the court found that he was a recidivist. Though we recognize that a 30-year sentence for a non-violent drug offense is a harsh penalty, it cannot be viewed as unreasonable in light of Glover's criminal history. We therefore affirm Glover's sentence.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM Glover's conviction and sentence.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*